**FILED**

SEP 3 0 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REED J. NEWLIN
2516 Liberty Drive
Maryville, Illinois 62026-6736,

OCTAVIA KINCHLOE
905 W. Panorama Dr., #206
Palatine, IL 60067,

DOREEN J. LEW
P. O. Box 32104
Oakland, CA 94604

On behalf of themselves and on
behalf of all others similarly situated,

              **Plaintiffs,**

        **v.**

SBC PENSION BENEFIT PLAN
111 Soledad, Suite 150
San Antonio, Texas 78205-2212,

SBC COMMUNICATIONS, INC.
111 Soledad, Suite 150
San Antonio, Texas 78205-2212,

              **Defendants.**

:
:
:
:
:
:
:
:
:

CASE NUMBER 1:05CV01939

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: Labor/ERISA (non-employment)

DATE STAMP: **/**/2005

**CLASS ACTION**

## CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege as follows:

### NATURE OF THE ACTION

1.    This is an action under the Employee Retirement Income Security Act of 1974, as

amended ("ERISA"), 29 U.S.C. § 1001, *et seq.* challenging the legality of the design and

operation of four ERISA-governed "cash balance" pension plans sponsored by SBC

Communications, Inc. ("SBC" or the "Company").

2.    Three of these four plans – the Pacific Telesis Group Cash Balance Pension Plan

for Salaried Employees (the "PTG Plan"), the Southern New England Telecommunications

Corporation Management Pension Plan ("SNET Plan"), Ameritech Management Pension Plan

("Ameritech Plan") – have since been merged (in 1999, 2000 and 2004, respectively) into the

fourth plan, Defendant SBC Pension Benefit Plan (the "SBC Plan" or "Plan"), following SBC's

acquisitions of PTG, SNET, and Ameritech (in 1997, 1998, and 1999, respectively).

3.    The SBC Plan, the lead defendant herein, is the Company's main defined benefit

plan covering most of its tens of thousands of management employees, including numerous

employees working and earning pension benefits in this District.

4.    As used herein, "Plan" refers to Defendant SBC Plan in its own right and/or as

successor to the former PTG, SNET and Ameritech Plans.  "Plans" also refers to the SBC Plan in

those regards but additionally refers to the former PTG Plan, the former SNET Plan and/or the

former Ameritech Plans (the "Merged Plans") and those Plans' benefit formulas while they were

in existence and are still to some degree operative.

5.    "SBC" refers to, among other things, all "SBC Participating Companies" and

"Controlled Group Members" as those terms are used in the SBC Plan, as well as all

predecessors, subsidiaries, affiliates, and subsidiaries and affiliates of all predecessors.

6.    This action is brought as a nationwide class action -- and appropriately so in this

District, where SBC not only employs numerous persons earning and/or receiving their pension

benefits but also transacts a considerable amount of business, as does the SBC Plan.  Indeed,

2

Defendant SBC Plan has already conceded personal jurisdiction and venue are proper in this

District and has further conceded that a class action can and should proceed against it in an

ERISA action brought by other participants on behalf of many thousands of SBC Plan

participants. *See Wagener v. SBC Pension Benefit Plan – Nonbargained Program*, 407 F.3d

395 (D.C. Cir. 2005) (reversing order of dismissal); *Wagener v. SBC Pension Benefit Plan –*

*Nonbargained Program*, 03-CV-769 (RCL), Doc. 33 (Answer ¶¶ 3-4, admitting personal

jurisdiction and venue properly asserted); Doc. 34 (Plan conceding plaintiffs' class motion); Doc.

35 (Court ordering class certified for all purposes of liability and relief and appointing

undersigned counsel as co-lead class counsel).

     7.     In that action, plaintiffs and the class allege that the SBC Plan miscalculated their

early retirement pension benefits and that the Plan is withholding tens of millions of dollars in

benefits they are due under the terms of the Plan. Here, by contrast, Plaintiffs, current and

former participants in the Plan and Merged Plans, bring allegations of a different character:

*statutory* violations of ERISA's accrued benefit standards and those applicable parallel standards

set forth in the Internal Revenue Code (the "Tax Code").

     8.     More specifically, Plaintiffs allege, on their own behalf and on behalf of a class of

all similarly situated participants (the "proposed Class"), that the Plans discriminated against

older and/or longer-serving participants in several different ways, including (a) discriminating

against them in the *rate* by which they accrued benefits under the Plans, in violation of ERISA

§ 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H); (b) discriminating

against them by actually *reducing* their accrued benefits because of increasing service, ERISA

§ 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(G), and Tax Code § 411(b)(1)(G) (age discrimination);

and (c) subjecting them to illegal "backloading," *i.e.*, causing their benefits to accrue in an unlawfully back weighted fashion, in violation of ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and Tax Code § 411(b)(1)(A)-(C).

9.      Accordingly, Plaintiffs respectfully ask the Court, *inter alia*: (1) to certify this case as a class action; (2) to declare that the Plans violated ERISA and applicable Tax Code standards in the manners set forth herein and as will later be demonstrated; (3) to order Defendants to bring the terms and administration of the SBC Plan and the Merged Plans into compliance with ERISA and the Tax Code; and (4) to provide Plaintiffs and the proposed Class with all other relief available to them under ERISA.

## SUBJECT MATTER JURISDICTION

10.     This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. Specifically, this action is brought under ERISA § 502(a), 29 U.S.C. § 1132(a).

## PERSONAL JURISDICTION

11.     This Court has personal jurisdiction over the SBC Plan and SBC because the SBC Plan and SBC transact business in, and have significant contacts with, the District of Columbia, and because ERISA provides for nationwide service of process. *See* D.C. Code § 13-423; ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

4

## VENUE

12.    Under ERISA § 502(e), 29 U.S.C. § 1132(e), an action "may be brought in the district where the plan is administered, where the breach took place, *or* where a defendant resides *or* may be found." Where venue is proper for one defendant, it is proper for all. *Id.*

13.    Venue here is proper for both defendants on three of the four bases provided by the statute.[1]

14.    First, the SBC Plan and/or SBC each "reside[]" here within the meaning of ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the SBC Plan and SBC are subject to the Court's personal jurisdiction: under 28 U.S.C. § 1391(a) as a corporation (SBC) or corporate entities (the SBC Plan), all are "reside[nts]" of this District within the meaning of ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

15.    Second, the SBC Plan and/or SBC "may be found" here because SBC and the SBC Plan transact business in, and have significant contacts with, the District of Columbia. SBC, among other things, has offices and offers services in the District of Columbia, the SBC Plan employs service providers in the District of Columbia, and proposed Class members earn and/or earned some or all of their Plan pension credits in the District of Columbia and/or receive and/or received Plan pension benefits in the District of Columbia.

16.    Third, some of the breaches occurred here with respect to the proposed Class because benefit due as a matter of law were not paid to proposed Class members that should have been paid in this District.

---

[1] Plaintiffs do not contend that the Plan is "administered" in this District.

## EXHAUSTION OF REMEDIES

17.    Exhaustion of Plan remedies is not required because the issues involved in this action raise only statutory question or issues of law which Congress intended be adjudicated by Article III judges, not employer-appointed plan administrators.

18.    In any event, Plaintiffs should be excused from any otherwise applicable requirement to exhaust plan remedies for one or more of the following reasons. First, as noted, Plaintiffs raise no claims as to which it would be appropriate to defer to the Plans' administrator.

19.    Second, the Plan does not provide any meaningful claims process as would be required by ERISA § 503, 29 U.S.C. § 1133, for challenges to the legality of the Plan's design of the type alleged in this suit.

20.    Third, any such attempt to exhaust would be futile:  although SBC recently announced it was discontinuing use of the Plan's "cash balance" formula for new accruals, *see, e.g.,* SBC Communications Inc. SEC Form Def 14A filed March 11, 2005 at 51, the Company has not indicated any willingness to acknowledge the age discriminatory nature of that formula, discontinue its use entirely or make adversely affected participants whole.  To the contrary: according to press reports, SBC specifically denied that concerns that the Plan was age discriminatory (or that the Company was facing additional plan funding liability) had any role in the decision.

21.    Fourth, any remedy provided under the terms of the Plan for the violations asserted would be inadequate because the Plan's claims procedures and remedies do not ordinary claimants' contentions resulting in wholesale reformation of the Plans' basic benefit formulas, which is the key remedy sought here.

6

## THE PARTIES

22.    Plaintiff Reed J. Newlin was and is a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the SBC Plan because although he received benefits from the SBC Plan, it owes him additional benefits implied by law that it has not yet paid him, as set forth herein. Moreover, the SBC Plan has not repudiated let alone clearly repudiated Plaintiff Newlin's right to those additional benefits.[2]

23.    Plaintiff Octavia Kinchloe was and is a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the SBC and Ameritech Plan (since merged into the SBC Plan) because although she received benefits from the SBC Plan, in its own right and as the Ameritech Plan's successor, owes her additional benefits implied by law that it has not yet paid here, as set forth herein. Moreover, the SBC Plan has not repudiated let alone clearly repudiated Plaintiff Kinchloe's right to those additional benefits.[3]

24.    Plaintiff Doreen Lew was and is a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the SBC Plan as well as one of its predecessors, the PTG Plan. She is a participant in the SBC Plan because the SBC Plan has paid her only some of the benefits which the SBC Plan acknowledges that it owes her: *i.e.,* the Plan has yet to distribute certain benefits to her which the Plan maintains (in violation of law, as set forth below) must be distributed in the form of an annuity. Plaintiff Lew is also a participant in the SBC Plan apart from those

---

[2] As noted, although SBC as the SBC Plan's *sponsor* appears unwilling to acknowledge or fund the Plan to pay those benefits, SBC *as fiduciary* has not in any manner (known to Plaintiff Newlin, in any event) repudiated or clearly repudiated his right to those additional benefits. Nor has the Plan, which is an entity separate and distinct from SBC. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1) (plan separate entity which can sue and be sued).

[3] *See supra* note 2.

acknowledged unpaid benefits because the SBC Plan owes her additional, unacknowledged benefits implied by law that it has not yet paid her, as set forth herein. As in the case of Plaintiff Newlin, the SBC Plan has not repudiated let alone clearly repudiated Plaintiff Lew's right to those additional benefits.[4]

25.    Defendant SBC Pension Benefit Plan (the "SBC Plan" or the "Plan") is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35).

26.    As noted, the SBC Plan is the successor in interest to, among other plans, the Merged Plans, *i.e.,* former Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees (the "PTG Plan"), the former Southern New England Telecommunications Corporation Management Pension Plan ("SNET Plan"), and the former Ameritech Management Pension Plan ("Ameritech Plan"). These Merged Plans also were at all relevant times "employee pension benefit plan[s]," and more specifically "defined benefit plan[s]," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35).

27.    Defendant SBC Communications, Inc. ("SBC") is the sponsor of the Plan, the Plan's plan administrator and a named fiduciary of the Plan, within the meaning of ERISA §§ 3(16)(A)-(B), 402(a), 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a). *See, e.g.,* SBC Plan

---

[4] *See supra* note 2.

8

§ 3.1.1(a).[5]  SBC also served in all those capacities as to the Merged Plans, following SBC's

acquisition of their corporate sponsors, prior to those Plans' merger into the SBC Plan.

## FACTS

### The SBC Plan's Traditional Formula

28.    The SBC Plan is a successor in interest to a number of defined benefit pension

plans formerly maintained by Bell telephone companies.  SBC Plan § 1.2[6]

29.    The SBC Plan's immediate predecessor was the Southwestern Bell Corporation

Management Pension Plan.  That plan was amended and restated as of May 1, 1992, to become

the SBC Pension Benefit Plan – Nonbargained Program (also referred to as the "SBC Plan").

30.    The SBC Plan used to have a traditional pension formula that promised any

participant who terminated employment on or before April 1, 1997, and certain other specified

participants, a benefit calculated in a manner common to most defined benefit pension plans.

---

[5] All citations to the "SBC Plan" are to the plan instrument governing the SBC Plan as restated through January 31, 2002 and as amended thereafter.  This version of the SBC Plan, and the version of the SBC Plan as restated through February 1, 1995 and as amended thereafter -- as well as all versions of the Ameritech, SNET and PTG Plans in effect during the relevant time -- are incorporated herein by reference in their entirety, along with plan instruments, writings or documents pertaining to the Plans.

[6] As SBC explains on its website, www.sbc.com: "SBC companies trace their roots to the original Bell Telephone Co." which was formed by Alexander Graham Bell in 1877 and incorporated as AT&T in 1885.  Prior to 1984, AT&T was the parent corporation of the "Bell System" (also known as "Ma Bell").  Effective January 1, 1984, a federal court ordered the divestiture of AT&T and its 22 regional companies, known as the Baby Bell companies.  These 22 regional telephone companies were organized into seven separate telephone companies as follows:  (1) Ameritech, (2) Bell Atlantic, (3) BellSouth, (4) NYNEX, (5) Pacific Telesis, (6) Southwestern Bell Communications ("SBC"), and (7) U.S. West.  Subsequent to the court-ordered divestiture in 1984, "Baby Bell" Southwestern Bell Communications ("SBC") engaged in the following transactions among others, or with former regional "Baby Bell" companies:  (1) in 1997, SBC acquired Pacific Telesis, which provided telephone service in California and Nevada;  (2) in 1998, SBC acquired Southern New England Telecommunications Corporation, which provided telephone service in Connecticut;  (3) In 1999, SBC acquired Ameritech, which provided telephone service in Illinois, Indiana, Michigan, Ohio and Wisconsin; and (4) in 2000, SBC and Bell South Corporation combined their wireless operations to form Cingular, which SBC partially owns.  These transactions, among others, resulted in the company known today as Defendant SBC Communications, Inc.

31.     The SBC Plan expressed this formula as a monthly benefit payable at Normal Retirement Age (age 65) equal to 1.6% *times* Adjusted Career Income, divided by twelve.  SBC Plan § 4.2.1(a); Plan § 4.5.1(a).

32.     The net result of the traditional formula and definition of Adjusted Career Income is that a participant's benefit under the SBC Plan before April 1, 1997 was approximately equal to a monthly annuity commencing at age 65 equal to 1.6% *times* the participant's years of employment with SBC (and/or one or more predecessor companies) *times* the participant's average salary over the five years preceding termination or retirement *divided* by twelve.

33.     For example, an employee who had worked at SBC (and/or one or more of its predecessors) for 25 years and whose average salary in his last five years of employment was $70,000 would be entitled to a monthly benefit commencing at age 65 equal to approximately (1.6% x 25 x $70,000) ÷ 12 = $2,333.33 per month, or $28,000 per year.  Various early retirement subsidies were available under the SBC Plan that may have allowed the participant to receive this annual benefit even before age 65 but this participant's "accrued benefit" under the SBC Plan for purposes of ERISA is $28,000 per year.

**The SBC Plan Adopts A Cash Balance Formula Effective April 1, 1997**

34.     Effective April 1, 1997, SBC converted the benefit formula under the SBC Plan from the traditional pension formula described above to a "cash balance" formula.  SBC Plan § 4.2.1(a).

35.     Under the new cash balance formula, the SBC Plan established a hypothetical account in each participant's name.  The account was initially credited with an amount equal to what SBC informed employees was the "lump sum present value" of their age-65 accrued benefit

under the prior SBC Plan formula as of March 31, 1997, calculated using "legally required factors." *See* participant communication entitled *Introducing Cash Balance* at 5 (incorporated herein by reference); SBC Plan Supplement 2.4 ("S2.4").

36.    Thereafter, and until quite recently, *see infra* ¶¶ 56-58, the accounts were increased each pay period by "Basic Benefit Credits" in an amount equal to 5% of each participant's compensation. SBC Plan §§ 4.2.1(a)(2)(ii)-(a)(3).

37.    Participants' account balances also were credited each month with "Interest Credits" based on the SBC Plan's Monthly Interest Crediting Rate. Plan § 4.2.1(a)(2)(iii).

38.    The Monthly Interest Crediting Rate for a particular month was defined as the monthly rate that, when compounded for 12 months, produces the published annual yield for 30-year Treasury bonds during the middle month of the previous quarter. SBC Plan § 2.1.

**Grandfathered Employees And The Transition Benefit Under The SBC Plan**

39.    Most employees who were on the payroll of an SBC subsidiary participating in the SBC Plan as of March 31, 1997 and still employees as of June 1, 1997 were considered "Grandfathered Employees" who were entitled to an additional "Transition Benefit."

40.    The Transition Benefit is calculated as follows: "We estimate what your account balance would have been if you had been under the cash balance plan design for your whole career (your "Total Career" Account Balance), add in extra credits for age and service if appropriate (see page 6) and then subtract your Opening Balance. The difference, your Transition Benefit, is paid with interest in monthly installments over five years, beginning in June, 1997." *Introducing Cash Balance* at 5.

11

41.     The extra age and service credits that were part of the Transition Benefits were as follows:

| Age + Service = Points | THEN add: |
|---|---|
| First 25 points | No age and service credits |
| > 25 up through 40 | 1% of pay for each point over 25 up through 40 |
| > 40 up through 50 | 1% of pay for each point over 25 up through 40 or 15% of pay, **plus** 3% of pay for each point over 40 up through 50 |
| > 50 | 1% of pay for each point over 25 up through 40 or 15% of pay, **plus** 3% of pay for each point over 40 up through 50 or 30% of pay, **plus** 5% of pay for each point over 50 |

Transition credits for age and service, however, could never exceed 125% of pay. *Introducing Cash Balance* at 6; SBC Plan S2.2.

**The SBC Plan's Grandfathered Benefit**

42.     The SBC Plan provided additional transition rules for Grandfathered Employees during the first five years following the conversion to a cash balance formula. During the first five years of the new plan design (referred to as the Transition Benefit period), a Grandfathered Employee who left SBC was entitled to the greater of his or her benefit calculated under the cash balance formula (including any Transition Credits) or under the old formula, as increased to reflect additional service and compensation throughout the five year period (the "Grandfathered Benefit").

43.     At the end of the Transition Benefit period, each participant's Grandfathered Benefit was frozen and became the participant's guaranteed minimum benefit. *Introducing Cash Balance* at 8.

**The Former Ameritech Plan**

44.    Prior to May 1, 1995, the Ameritech Management Pension Plan (the "Ameritech

Plan") had a traditional pension benefit formula which was substantially similar to the SBC

Plan's traditional benefit formula (before the SBC Plan was converted to a cash balance plan).

Effective May 1, 1995, Ameritech amended the Ameritech Plan to convert the benefit formula to

a "pension equity" formula (referred to in the plan as a "Defined Lump Sum" or "DLS").

45.    Under the Ameritech Plan's pension equity formula, a participant's benefit was

equal to a benefit with a lump sum present value equal to his accumulated pension credits *times*

his final average pay (as defined under the Ameritech Plan).  Accumulated pension credits were

calculated as the sum of a participant's monthly pension credits, which were based on the

participant's age in the month each credit was received pursuant to the following chart:[7]

| Age During the Month | Pension Credit Rate | Equivalent Age-65 Accrual Rate |
|---|---|---|
| Under age 30 | 6 % | 8.3 % |
| 30-34 | 7 % | 5.4 % |
| 35-39 | 8 % | 4.6 % |
| 40-44 | 10 % | 4.3 % |
| 45-49 | 12 % | 3.8 % |
| 50-54 | 15 % | 3.6 % |
| Age 55 and over | 20 % | 3.6 % |

---

[7] Columns 1 and 2 of the chart are from the Plan.  Column 3 reflects Plaintiffs' calculations for a participant at the lowest end of each age band (age 20 for the "under 30" band), assuming an interest rate of 6% for purposes of projecting benefits to age 65.

Ameritech Plan SPD, February 2002 ("2002 Ameritech Plan SPD") at 9.

46.    A participant who terminated employment before age 65 (normal retirement age under the Ameritech Plan) was entitled to take his benefit in the form of an immediate lump sum or an immediate annuity with the same actuarial value. Alternatively, the participant could opt for a deferred annuity (but not a deferred lump sum) payable at a later date. The amount of any deferred annuity was calculated as follows: When a participant terminated employment, his DLS benefit was projected to age 65 based on the rate payable on 30-year Treasury bonds. Any payment of a deferred annuity commencing at age 65 would receive an annuity based on this projected age-65 balance. Any deferred annuity paid at an earlier date was based on the actuarial equivalent of the age-65 annuity. 2002 Ameritech Plan SPD at 13-15.

47.    SBC acquired Ameritech Corporation in 1999 and continued to maintain the Ameritech Plan as a separate plan. After the Ameritech Plan was converted to a pension equity plan, and again after Ameritech was acquired by SBC, various transition benefits were provided under the plan, similar in nature to the transition benefits provided under the SBC Plan. In some cases, these transition benefits were larger than the benefits payable under the pension equity formula for months or years after the conversion and/or acquisition.

48.    Effective December 31, 2004, the Ameritech Plan was merged into the SBC Plan. Effective January 15, 2005, most of the Ameritech Plan's separate features were eliminated in connection with the plan's consolidation into the SBC Plan. At that time, each participant's DLS benefit was frozen and converted into a cash balance account. Interest credits (but not pay credits) continue to accrue on such accounts until benefits are fully distributed.

14

**The SBC Plan's And The Former Ameritech Plan's New CAM Benefit - 2001**

49.    Effective as of June 14, 2001, SBC amended the SBC Plan and the Ameritech

Plan to provide that each participant who terminated employment after June 13, 2001 would be

entitled to a benefit that was equal to the greater of his benefit accrued under the cash balance or

pension equity formulas under those plans or a new minimum monthly benefit, the Career

Average Minimum or "CAM Benefit," payable at Normal Retirement Age.

50.    The CAM Benefit is equal to one-twelfth of 1.6% of each participant's CAM

Income, which is calculated in a manner similar to the way Adjusted Career Income was

determined for purposes calculating benefits under the traditional formula described above.  SBC

Plan Supplement 12: CAM Benefits; Ameritech Plan, CAM Benefits.

51.    Net CAM Benefits (*i.e.,* CAM Benefits that exceeded the cash balance or pension

equity benefit) that were less than $400 per month could be received in the form of a single lump

sum distribution.  However, when the net CAM Benefit crossed the "CAM Excess Limit"

threshold of $400 per month, participants were no longer entitled to receive their net CAM

Benefits in the form of a single lump sum.  SBC Plan S.12.3; Ameritech Plan, CAM Benefits.

52.    For participants in the SBC Plan, the combined effect of the cash balance formula,

the Grandfathered Benefit, and the new "greater-of" formula adopted as of June 14, 2001, was

that for each Grandfathered Employee, the benefit accrued under the SBC Plan for each period

between April 1, 1997 and January 14, 2005 (when the cash balance formula was frozen) was an

amount equal to the greater of the benefit accrual determined under the cash balance formula or

the accrual under the traditional pension formula (either in the form of grandfathered benefits or

CAM benefits).

15

53.    For participants in the Ameritech Plan, the combined effect of the pension equity

formula, the transition benefits provided under the plan, and the new "greater-of" formula

adopted as of June 14, 2001, was that for each employee who was employed by Ameritech on

May 1, 2005, the benefit accrued under the Ameritech Plan for each period between May 1, 1995

and January 14, 2005 (when the pension equity formula was frozen) was an amount equal to the

greater of the benefit accrual determined under the pension equity formula or the accrual under

the traditional pension formula (either in the form of grandfathered benefits or CAM benefits).

54.    For SBC Plan participants who were not Grandfathered Employees, the benefit

they accrued under the SBC Plan for each period between April 1, 1997 and January 14, 2005

was an amount determined under the cash balance formula (with certain transition rights and

benefits provided to former PTG and SNET Plan participants, as described in Supplements 1 and

8 of the SBC Plan).

55.    For Ameritech Plan participants who were not grandfathered employees under

that Plan (*i.e.*, not employed as of May 1, 1995), the benefit they accrued for each period

between May 1, 1995 and January 14, 2005, was an amount determined under the Ameritech

Plan's pension equity formula



**SBC Freezes The SBC Plan's And The Ameritech Plan's Cash Balance Formulas - 2005**

56.    Effective as of January 14, 2005, SBC amended the SBC Plan (which by that time had absorbed the Ameritech Plan) to provide that Basic Benefit Credits and pension equity (or "DLS") credits would no longer be made under the Plans' cash balance and pension equity formulas. *See* SBC Communications Inc. SEC Form Def 14A filed March 11, 2005 at 51.

57.    Notwithstanding this action, under the Plans' cash balance and pension equity formulas, interest credits continue to be credited to existing participant accounts each month.

58.    This means that the cash balance and pension equity benefits are frozen and henceforth "will not increase except with interest." *See* "Understanding Your Pension Benefit," at 2, SBC participant communication, March 2005.

**The Former PTG Plan**

59.    Around the same time it was converting its traditional pension plan to a cash balance pension plan (April 1, 1997), SBC acquired PTG and thereupon became the PTG Plan's sponsor, plan administrator and a named fiduciary.

60.    PTG had already, approximately a year earlier, converted its management pension plan's traditional pension formula to a cash balance formula effective as of March 22, 1996.

61.    Under the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees ("PTG Plan"), each employee with an accrued benefit under the PTG Plan at the time of the conversion was credited with an opening cash balance amount approximately equal to the balance the employee would have earned had the cash balance formula been in place since the employee's date of hire by PTG. *See* SBC Summary Plan Description dated March 1999 ("1999 SPD") at PB 10.

17

62.     Each PTG employee who had been a participant in the PTG plan between March 22, 1996 and June 30, 1996 ("Grandfathered PTG Employee") also was promised an Accelerated Transition Benefit ("ATB").

63.     The ATB was a traditional pension benefit payable monthly at age 65 equal to 2% of each eligible employee's average monthly compensation from July 1, 1991 to June 30, 1996 *times* the employee's years of service with PTG as of June 30, 1996. Each Grandfathered PTG Employee, moreover, was guaranteed a pension benefit no less valuable than his or her accrued benefit under the PTG Plan as of the date the PTG Plan was converted to a cash balance Plan. 1999 SPD at PB 25.

64.     For many Grandfathered PTG Employees, their opening cash balance, when expressed as an annual benefit commencing at age 65 (the normal retirement age under the PTG Plan), was smaller than the employee's ATB and/or the employee's accrued benefit under the PTG Plan as of the date of its conversion to a cash balance plan.

65.     The cash balance formula under the PTG Plan was substantially similar to the cash balance formula under the Plan. *See Introducing Cash Balance* at 1.

66.     For Grandfathered PTG Employees whose ATB benefit or accrued benefit under the PTG Plan as the date of conversion exceeded their opening account balances, credits to the employee's cash balance accounts resulted in no net increase in their accrued benefit under the PTG Plan for several months or years. The period over which these Grandfathered PTG Employees failed to accrue new benefits under the PTG Plan was longer for older employees than for similarly-situated younger employees.

18

67.    A little less than two years after SBC acquired PTG, on January 1, 1999 SBC merged the PTG Plan into the SBC Plan.

68.    Following the plan merger, former participants in the PTG Plan became participants in the SBC Plan and began to accrue benefits under the basic SBC cash balance formula.

69.    Effective as of the date of the plan merger, still-employed Grandfathered PTG Employees were promised a Special ATB.

70.    The Special ATB was equal to the present value of each eligible employee's ATB on January 1, 1999. The Special ATB was credited with interest credits (but not pay credits) through December 31, 2001, at which point it was frozen. 1999 SPD at PB 31. Thereafter, former PTG Plan participants accrued benefits only under the generally applicable benefit formula under the SBC Plan.

71.    For Grandfathered PTG Employees whose Special ATB benefit exceeded their opening account balance under the SBC Plan, credits to the employee's SBC cash balance accounts resulted in no net increase in their accrued benefit under the SBC Plan for several months or years. The period over which these Grandfathered PTG Employees failed to accrue new benefits under the SBC Plan was longer for older employees than for similarly-situated younger employees.

72.    At the point when Grandfathered PTG Employees ultimately began to accrue new net benefits under the PTG Plan and/or SBC Plan, their net rate of benefit accrual went from zero to a positive rate.

19

**The Former SNET Plan**

73.    SBC acquired Southern New England Telecommunications Corporation ("SNET") in 1998 and thereupon become the SNET Plan's sponsor, administrator and a named fiduciary.

74.    Two years prior to SBC's acquisition of SNET, SNET converted its management pension plan's traditional pension formula to a cash balance formula effective as of January 1, 1996. The terms of the SNET Plan and that Plan's summary plan descriptions are incorporated by reference herein.

75.    Under the SNET's cash balance formula, the amount of a participant's Basic Pay Credits varied based on a participant's combined years of age and service. The formula also provided Supplemental Pay Credits if a participant's actual pay was greater than 80% of the Social Security wage base. Interest Credits also were awarded each month at a rate stated under the plan.

76.    Effective January 1, 2000, SBC merged the SNET Plan into the SBC Plan.

77.    During the year 2000, under the SBC Plan, former SNET Plan participants continued to earn monthly Basic Pay Credits and Supplemental Pay Credits calculated using the former SNET Plan's cash balance formula.

78.    Effective January 1, 2001, these participants began earning Basic Pay Credits as under the SBC Plan's formula of 5% of actual pay (called "Basic Benefits" under the SBC Plan instead of "Basic Pay Credits" as under the SNET Plan). Also effective January 1, 2001, Supplemental Pay Credits were discontinued.

20

79.    For SNET employees hired or rehired in 2000, the SBC Plan's formula of 5% of

actual pay (Basic Benefits) was employed.

80.    After the merger of the SNET Plan into the SBC Plan, each participant was

entitled to a benefit calculated as the greatest of the following three amounts: (1) the participant's

account balance as of December 31, 1999, plus interest at 3% per year; (2) the participant's

account balance as of December 31, 1999, projected to age 65 using an assumed interest rate of

3% per year; or (3) the benefit calculated under the SBC Plan.

## CLAIMS FOR RELIEF

## COUNT ONE

### AGE DISCRIMINATION ARISING FROM THE PLANS' CASH BALANCE AND PENSION EQUITY FORMULAS

81.    Plaintiffs repeat and re-allege the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

82.    Plaintiffs bring this claim on behalf of themselves and members of the proposed

Class.

83.    After each of the SBC Plan and the Merged Plans were amended to add cash

balance or pension equity formulas, and before June 14, 2005 when the cash balance and pension

equity formulas were frozen ("the cash balance formula period"), participants in the Plans

accrued benefits in whole or part under the cash balance or pension equity formula under the

Plans.

84.    When the CAM formula was added to the Plans effective as of June 15, 2001,

participants in the Plans were guaranteed an annual accrual of no less than 1.6% of their

21

Adjusted Career Incomes. In addition, many participants who were employed as of the dates the cash balance and pension equity features were added were entitled to certain transition and grandfather benefits summarized above and more fully described in the Plans and Summary Plan Descriptions. For participants eligible for these benefits, the benefit they accrued under the Plans was an amount equal to the *greater of* (1) the benefit accrual determined under their plan's cash balance or pension equity formula, (2) the benefit accrual under the CAM formula, or (3) the benefit accrual under the transition and/or grandfather formulas.

85.    Even taking account the effect of the CAM formula and the transition and grandfather benefits, benefits accrued under the Plans during the cash balance period violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), because benefits under the Plans during that period accrued at a rate that was reduced because of age or the attainment of any age.

86.    This result is evident when the benefits under the Plans are expressed in terms of an annual benefit commencing at normal retirement age (age 65), which is the basis on which ERISA and the Tax Code require a defined benefit plan participant's "rate of benefit accrual" to be tested for compliance with ERISA and Tax Code accrued benefit standards. ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A), and Tax Code § 411(a)(7)(A)(i).

87.    The benefits that accrued under the *cash balance* formulas was described in terms of the addition of pay credits to participant "accounts" in an amount equal to a stated percentage of each participant's compensation. However, the "rate of benefit accrual" under the cash balance formulas within the meaning of ERISA and the Tax Code was not that stated

22

percentage, but rather the resulting increase in the annual benefit projected to commence at age 65.

88.     The violation arose because pay credits to participants' cash balance accounts resulted in a larger increase in the projected age-65 benefit accrued by a younger employees than the same credit to a similarly-situated older employee. For example, using the 30-year Treasury bond rate from November 2001 of 5.32%, a 5%-of-pay credit allocated to the cash balance account of a 30-year-old employee was equivalent to a benefit accrual at age 65 of approximately 2.6% of salary (assuming an annuity factor of 12).[8]  For a 50-year-old employee, a 5% benefit credit was equivalent to a benefit accrual at age 65 of approximately 0.1% of salary (using the same assumptions).

89.     In the example just provided, the older employee would have accrued a benefit equal to 1.6% of Adjusted Career Income for periods on and after June 15, 2001. The participant may also have been eligible for certain other transition and/or grandfather benefits that may have increased his rate of accrual. However, older participants received smaller benefit accruals during the cash balance period even when these additional benefits are taken into account.

90.     In fact, the SBC Plan Transition Benefits themselves (and other transition benefits under the other Plans) violated ERISA's age discrimination standards. For example, within each "points" band used to calculate the SBC Transition Benefits (*i.e.*, up to 25, 26-40, 41-50, and over 50), younger participants in the band received larger transition benefit accruals, when expressed as an age-65 annuity, than similarly situated yet older employees in the same band.

---

[8] The math is $[5\% \times (1.0532)^{35}] \div 12 = 2.6\%$

91.     A similar discriminatory benefit accrual pattern occurs with respect to benefits earned in whole or in part under the *pension equity* formula in the Ameritech Plan, as illustrated in the chart set forth in the Facts section, *supra.*  The age discrimination pattern remains for Ameritech Plan participants even when the CAM formula and the additional transition and grandfather benefits are taken into account.  (If pension equity credits are not expressed as equivalent age 65 annuity benefits, the Ameritech Plan violates ERISA and Tax Code anti-backloading standards.)

92.     The result is that the rate at which benefits accrued under the Plans during the cash balance period was generally larger for younger employees than for similarly situated older employees.  This violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), which makes it unlawful for a defined benefit pension plan to reduce the rate at which benefits accrue because of age or the attainment of any age.

93.     As a result of the violations described in this Count, Plaintiffs and other participants under the Plans accrued benefits during the cash balance period that were smaller than the benefits they would have accrued had the Plans complied with ERISA and Tax Code age discrimination standards.

## COUNT TWO

### AGE DISCRIMINATION AND BACKLOADING ARISING FROM THE FORMER PTG PLAN'S BENEFIT FORMULA

94.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

95.     Plaintiffs bring this claim on behalf of themselves and members of the proposed Class.

96.     For each Grandfathered PTG Employee whose ATB or accrued benefit under the PTG Plan as the date of its conversion into a cash balance plan in 1996 exceeded their opening account balance, credits to the employee's cash balance account resulted in no net increase in the employee's accrued benefit under the former PTG Plan for several months or years. The period over which these Grandfathered PTG Employees failed to accrue new benefits under the PTG Plan was longer for older employees than for similarly-situated younger employees.

97.     This violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), which makes it unlawful for a plan to reduce the rate at which benefits accrue because of age or the attainment of any age. Older participants continued to accrue benefits at a net rate of zero for longer periods than similarly situated younger employees solely because they were older.

98.     Following the merger of the PTG Plan into the SBC Plan, many Grandfathered PTG Employees had Special ATB benefits that exceeded their opening account balance under the SBC Plan. For these employees, credits to their SBC cash balance accounts resulted in no net increase in their accrued benefit under the SBC Plan for several months or years. The period

over which these Grandfathered PTG Employees failed to accrue new benefits under the SBC

Plan was longer for older employees than for similarly-situated younger employees.

99.    Again, this violated the age discrimination standard set forth in ERISA

§ 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), which makes it

unlawful for a plan to reduce the rate at which benefits accrue because of age or the attainment of

any age.

100.    At the point when Grandfathered PTG Employees ultimately began to accrue new

net benefits under the PTG Plan and/or SBC Plan, the employees' net rate of benefit accrual

went from zero to a positive rate.

101.    This violated ERISA's anti-backloading rules, codified at ERISA

§ 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and Tax Code § 411(b)(1)(A)-(C), which

require that benefits accrue roughly pro rata over the course of an employee's career, rather than

being unlawfully back weighted.

102.    At any point at which a participant in the PTG Plan accrued benefits under the

PTG Plan's cash balance formula, the PTG Plan violated the age discrimination standard set

forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H),

because the rate at which benefits accrued under the PTG Plan's cash balance formula was larger

for younger employees than for similarly situated older employees.

103.    As a result of the violations described in this Count, Plaintiff Lew and other

participants and former participants of the PTG Plan accrued benefits under the PTG Plan and/or

the SBC Plan (after the PTG Plan merged with the SBC Plan) between March 22, 1996, and

January 14, 2005, that were less than the benefits they would have accrued had the PTG Plan and

the SBC Plan complied with ERISA and Tax Code age discrimination standards.

## COUNT THREE

### AGE DISCRIMINATION ARISING FROM
### LOSS OF LUMP SUM OPTION FOR CAM BENEFITS UNDER THE PLANS

104.    Plaintiffs repeat and re-allege the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

105.    Plaintiffs bring this claim on behalf of themselves and members of the proposed

Class.

106.    When the amount of the net CAM Benefit accrued by participants under the SBC

Plan and Ameritech Plan crossed the CAM Excess Limit threshold of $400 per month, SBC Plan

and Ameritech Plan participants were no longer entitled to receive their net CAM Benefits in the

form of a single lump sum distribution.

107.    This resulted in a violation of the age discrimination standard set forth in ERISA

§ 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), and Tax Code § 411(b)(1)(G), which makes it

unlawful for a plan to reduce a participant's accrued benefit because of increasing service.

108.    A participant's right to receive the amount of his or her accrued benefit in the

form of a lump sum is an integral part of the "accrued benefit." As the Supreme Court

recognized in *Central Laborers Pension Fund v. Heinz*, 124 S. Ct. 2230, 2235-36 (2004)

(internal quotes omitted), "as a matter of common sense, [a] participant's benefits cannot be

understood without reference to the conditions imposed on receiving those benefits, and an

27

amendment placing materially greater restrictions on the receipt of the benefit 'reduces' the

benefit just as surely as a decrease in the size of the monthly benefit payment."

109.    By stripping participants of the right to take their net CAM Benefits as a lump

sum merely because the participants continue to work and accrue benefits that put them over the

$400 CAM Excess Limit, the Plans therefore unlawfully reduced participants' accrued benefits

solely on account of increased service.

110.    As a result of the violations described in this Count, Plaintiff Lew and

participants in the Plans whose net CAM Benefit amount crossed the CAM Excess Limit

threshold of $400 were unlawfully denied benefits that they would have been entitled to had the

Plans complied with ERISA and Tax Code age discrimination standards.

### CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring suit on behalf of themselves and on behalf of all other

participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal

Rules of Civil Procedure with respect to violations alleged herein.

112.    The proposed Class is defined as follows:

All persons who participated in the SBC Pension Benefit Plan – Nonbargained
Program at any time after March 31, 1997; the SNET Management Pension Plan
at any time after December 31, 1995; the Pacific Telesis Group Cash Balance
Pension Plan for Salaried Employees at any time after March 21, 1996; and/or the
Ameritech Management Pension Plan at any time after May 1, 1995, and the
beneficiaries and estates of such persons.[9]

113.    The requirements for maintaining this action as a class action under Fed. R. Civ.

P. 23(a) are satisfied in that there are too many Class members for joinder of all of them to be

---

[9] This definition is without prejudice to Plaintiffs' right to propose a broader or narrower class and/or additional
classes and/or subclasses following discovery.

practicable. There are tens of thousands of members of the proposed Class (hereinafter, the "Class") dispersed among many states.

114.    The claims of the Class members raise numerous common questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2). Every issue or nearly every issue concerning liability is common to all Class members because such issues concern their entitlement to benefits calculated in a manner other than that calculated thus far and their entitlement to relief from harm caused by the violations of law, rather than any action taken by Plaintiffs or any Class member. In addition, every issue or nearly every issue concerning relief is also common to the Class for the same reason.

115.    Plaintiffs' claims are typical of the claims of the Class members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3). They do not assert any claims in addition to or different than those of the Class.

116.    Plaintiffs are adequate representatives of the Class, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are identical to those of the Class. Defendants have no unique defenses against them that would interfere with their representation of the Class. Plaintiffs have engaged counsel with considerable ERISA class action litigation experience.

117.    Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

118.    Alternatively, all of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that Defendants' actions affected all Class members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants and that the Court award the following relief:

A.    Certification of this action as a class action for all purposes of liability and relief and appointment of undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23;

B.    Judgment for Plaintiffs and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint;

C.    An order awarding, declaring or otherwise providing Plaintiffs and the Class all other such relief to which Plaintiffs and the Class are or may be entitled whether or not specified herein.

The relief Plaintiff seeks includes but is not limited to:

D.    An order declaring that Defendants violated and are violating ERISA's accrued benefit standards in the specific manners alleged in this Complaint and in such other manners as Plaintiffs shall demonstrate to the Court's satisfaction;

E.    An order enjoining Defendants from continuing to violate the law in the manners alleged or referenced in this Complaint or hereafter proven.

F.    An order reforming the Plan and/or compelling SBC to reform the Plan and/or compelling Defendants to bring the terms and administration of the Plan into compliance with ERISA;

F.      Following entry of other predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to re-calculate the benefit amounts due under the terms of the Plan in accordance with the requirements of ERISA, and for the Plan to pay the difference, plus interest, to or on behalf of all Class members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which Class members are entitled in all applicable optional forms (such as lump sum distributions);

G.      An order awarding pre- and post-judgment interest.

H.      An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiffs' election), along with the reimbursement of the expenses incurred in connection with this action.

I.      An order awarding, declaring or otherwise providing Plaintiffs all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiffs may subsequently specify and/or that the Court may deem appropriate.

Dated: September 30, 2005   By:

Eli Gottesdiener (D.C. Bar No. 420764)
**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
Phone: (202) 243-1000
Fax:    (202) 243-1001

Attorney for Plaintiffs and the proposed Class

31