## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **REED J. NEWLIN,** | **:** | |
| | **:** | |
| **OCTAVIA KINCHLOE,** | **:** | |
| | **:** | |
| **DOREEN J. LEW,** | **:** | |
| | **:** | |
| **BRADFORD J. PARSONS** | **:** | |
| **26 Park View** | **:** | |
| **Kensington, CT  06037,[1]** | **:** | |
| | **:** | |
| **On behalf of themselves and on** | **:** | |
| **behalf of all others similarly situated,** | **:** | |
| | **:** | **No.  05-CV-1939 (CKK)** |
| **Plaintiffs,** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **SBC PENSION BENEFIT PLAN,** | **:** | |
| | **:** | |
| **and** | **:** | |
| | **:** | |
| **AT&T INC.,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |
| | **:** | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs, by and through their counsel, allege as follows:

---

[1] Mr. Parsons' address is set forth in conformance with Local Civil Rule 5.1(e)(1) because he is a new plaintiff who was not a party to the original Complaint.

## TABLE OF CONTENTS

Nature of the Action……………………………………………………..…..…1

Subject Matter Jurisdiction………………………………………………………3

Personal Jurisdiction………………………………………………………………...3

Venue………………………………………………………………….………………3

Exhaustion of Remedies…………………………………………………………...5

The Parties………………………………………………………..……………………..6

Facts……………………………………………………………………………..9

      The SBC Plan's Traditional Formula……………..…………………………..9

      The SBC Plan Adopts A Cash Balance Formula Effective June 1, 1997…………..  10

      Grandfathered Employees And The Transition Benefit Under The SBC Plan
      The Former Ameritech Plan………………………………………………………11

      The SBC Plan's And The Former Ameritech Plan's New CAM Benefit – 2001……19

      2005 Freeze Of The SBC Plan's Cash  Balance Formula…………………………....23

      The Former PTG Plan………………………………………………………………..23

      The Former  SNET Plan…………………………………………………………...27

Claims for Relief…………………………………………………..……………………..29

      Count One-Age Discrimination under the SBC Plan's
      Transition Benefit Formula………………………………………………………29

      Count Two-Age Discrimination under the Ameritech Plan's
      Opening DLS Benefit Formula……………………………………………………30

      Count Three-Age Discrimination under the PTG Plan's
      Opening Cash Balance Account Formula……………………………………………31

      Count Four-Age Discrimination under the Plans'
      Ongoing Cash Balance and Pension Equity Formulas………………………………32

Count Five-Unlawful Conditioning of Lump Sum Benefits
by the SBC Plan on the Performance of Additional Services…………………………..33

**Class Action Allegations**……………………………………………………………………34

**Prayer for Relief**……………………………………………………………...……………..37

**Certificate of Service** ……………………………………………………………………39

**NATURE OF THE ACTION**

1.      This is a class action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.* challenging the legality of the design and operation of four ERISA-governed "cash balance" and "pension equity" retirement plans sponsored by SBC Communications Inc. ("SBC" or the "Company"), recently renamed AT&T Inc. following SBC's acquisition of AT&T Corp., effective November 18, 2005.

2.      The SBC Pension Benefit Plan (the "SBC Plan" or "Plan"), the lead defendant herein, is the Company's main defined benefit plan covering most of its tens of thousands of management employees, including numerous employees working and earning pension benefits in this District.

3.      The other three plans at issue (the "Merged Plans") – the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees (the "PTG Plan"), the Southern New England Telecommunications Corporation Management Pension Plan ("SNET Plan"), and the Ameritech Management Pension Plan ("Ameritech Plan") – were merged (in 1999, 2000 and 2004, respectively) into the SBC Plan, following SBC's acquisitions of PTG, SNET, and Ameritech (in 1997, 1998, and 1999, respectively).

4.      Plaintiffs allege that all four plans unlawfully discriminate against plan participants on account of their age or increasing service.  The plans do this in the following ways:

- On the date each of the SBC, Ameritech, and PTG Plans were converted from traditional pension plans to "cash balance" or "pension equity" plans, many younger participants enjoyed significant one-time benefit accruals under the

plans as part of the conversion.  In contrast, employees who were similarly situated, though older, generally enjoyed much smaller increases, or in some cases no increase, in their accrued benefit under the plans – solely because they were older.  (The "Opening Balance Violation").

- Under each of the SBC, Ameritech, PTG, and SNET Plans, the rate at which benefits accrued under the Plans after the Plans were converted to cash balance or pension equity plans was systematically larger for younger employees than for similarly-situated, but older, employees – again, solely because the latter group of employees was older.  (The "Declining Rate of Accrual Violation").

- Under the SBC and Ameritech Plans, participants forfeit the ability to take a portion of their benefit in the form of a single lump sum solely because they continue to work beyond a specified number of years.  (The "Forfeiture Violation").

The violations alleged against each of the plans are summarized in the following chart:

| Plan | Opening Balance Violation | Declining Rate of Accrual Violation | Forfeiture Violation |
|------|:---:|:---:|:---:|
| SBC | ☑ | ☑ | ☑ |
| Ameritech | ☑ | ☑ | ☑ |
| PTG | ☑ | ☑ | |
| SNET | | ☑ | |

5.    Plaintiffs respectfully ask the Court, *inter alia*:  (1) to certify this case as a class action; (2) to declare that the Plans violated and violate ERISA and parallel Internal Revenue Code standards in the manners set forth herein and as will later be demonstrated; (3) to order Defendants to bring the terms and administration of the Plans into compliance with

ERISA and the Internal Revenue Code; and (4) to provide Plaintiffs and members of the proposed Class with all other relief available to them under ERISA.

## SUBJECT MATTER JURISDICTION

6.    This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. Specifically, this action is brought under ERISA § 502(a), 29 U.S.C. § 1132(a).

## PERSONAL JURISDICTION

7.    This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, the District of Columbia, and because ERISA provides for nationwide service of process.  *See* D.C. Code § 13-423; ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## VENUE

8.    Under ERISA § 502(e), 29 U.S.C. § 1132(e), an action "may be brought in the district where the plan is administered, where the breach took place, *or* where a defendant resides *or* may be found."  Where venue is proper for one defendant, it is proper for all.  *Id.*

9.    Venue here is proper for both defendants on three of the four bases provided by the statute.

10.    First, the SBC Plan and/or SBC/AT&T each "reside[]" here within the meaning of ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the SBC Plan and SBC/AT&T are subject to the Court's personal jurisdiction:  under 28 U.S.C. § 1391(a) as a corporation (SBC/AT&T) or corporate entities (the SBC Plan), all are "reside[nts]" of this District within the meaning of ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

3

11.    Second, the SBC Plan and/or SBC/AT&T "may be found" here because

SBC/AT&T and the SBC Plan transact business in, and have significant contacts with, the

District of Columbia.  SBC/AT&T, among other things, has offices and offers services in the

District of Columbia, the SBC Plan employs service providers in the District of Columbia,

and proposed Class members earn and/or earned some or all of their Plan pension credits in

the District of Columbia and/or receive and/or received Plan pension benefits in the District of

Columbia.

12.    Third, some of the breaches occurred here with respect to the proposed Class

because benefits due as a matter of law were not paid to proposed Class members that should

have been paid in this District.

13.    The Plan has conceded that personal jurisdiction and venue are proper in

District in another nationwide ERISA class action filed by undersigned counsel (together with

co-counsel) and pending before Judge Lamberth.  *See Wagener v. SBC Pension Benefit Plan –*

*Nonbargained Program*, 407 F.3d 395 (D.C. Cir. 2005) (reversing order of dismissal);

*Wagener v. SBC Pension Benefit Plan – Nonbargained Program*, 03-CV-769 (RCL), Doc. 33

(Answer ¶¶ 3-4; Plan admitting personal jurisdiction and venue); Doc. 34 (agreeing case

should be certified under Rule 23); Doc. 35 (Court granting class certification motion,

ordering class certified for all purposes of liability and relief, and appointing undersigned

counsel as co-lead class counsel).[1]

---

[1] In the *Wagener* action, plaintiffs and the class allege that the SBC Plan miscalculated their early retirement pension benefits and that the Plan is withholding benefits they are due under the terms of the Plan.  Here, by contrast, Plaintiffs, current and former participants in the Plan and Merged Plans, bring allegations of a different character:  that some of the Plans' provisions (unrelated to the Plan provisions at issue in *Wagener*) violate ERISA's accrued benefit standards and the parallel standards set forth in the Internal Revenue Code.

**EXHAUSTION OF REMEDIES**

14.     Exhaustion of Plan remedies is not required because the issues involved in this action raise only statutory question or issues of law that Congress intended be adjudicated by Article III judges, not employer-appointed plan administrators.

15.     In any event, Plaintiffs should be excused from any otherwise applicable requirement to exhaust plan remedies for one or more of the following reasons.  First, as noted, Plaintiffs raise no claims as to which it would be appropriate to defer to the Plan's administrator.  For that reason, any review by this Court would be *de novo*.  Requiring Plaintiffs to pursue a lengthy exhaustion process would defeat Congress' intent to provide participants with ready access to the courts as a way to right ERISA wrongs.

16.     Second, the Plan does not provide any meaningful claims process as would be required by ERISA § 503, 29 U.S.C. § 1133, for challenges to the legality of the Plan's design of the type alleged in this suit.

17.     Third, any such attempt to exhaust would be futile:  although SBC/AT&T recently announced it was discontinuing use of the Plan's "cash balance" formula for new accruals, *see, e.g.,* SBC Communications Inc. SEC Form Def 14A filed March 11, 2005 at 51, the Company has not indicated any willingness to acknowledge the age discriminatory nature of that formula, discontinue its use entirely, or make adversely affected participants whole.

18.     Fourth, any remedy provided under the terms of the Plan for the violations asserted would be inadequate because the Plan's claims procedures and remedies do not contemplate reformation of the Plan's provisions to the extent they are unlawful.

Declarations of illegality or invalidity and plan reformation are the predominant forms of relief sought in this lawsuit.

## THE PARTIES

19.    Plaintiff Reed J. Newlin is a former employee of the Company.  Mr. Newlin participated in the SBC Plan during his period of employment with the Company and remains a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the Plan because although he received benefits from the SBC Plan, as a matter of law it owes him additional benefits that it has not yet paid him, as set forth herein.  Neither the SBC Plan nor the Company has clearly repudiated Plaintiff Newlin's right to those additional benefits, because while they have not paid or stated a willingness to pay those benefits, neither have they yet specifically stated that they will not do so.  Mr. Newlin was a participant in the SBC Plan on the date the SBC Plan was converted to a cash balance plan in 1997.

20.    Plaintiff Octavia Kinchloe is a former employee of the Company.  Ms. Kinchloe participated in the Ameritech Plan and the SBC Plan during her period of employment with the Company and remains a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the SBC Plan (in its own right and as the Ameritech Plan's successor) because although she received benefits from the Plans, as a matter of law the Plans owe her additional benefits that they have not yet paid her, as set forth herein.  Neither the Plans nor the Company has clearly repudiated Plaintiff Kinchloe's right to those additional benefits, because while they have not paid or stated a willingness to pay those benefits, neither have they yet specifically stated that they will not do so.  Ms. Kinchloe was a participant in the Ameritech Plan on the date the Ameritech Plan was converted to a cash balance plan in 1995.

6

21.    Plaintiff Doreen Lew is a former employee of the Company.  Ms. Lew participated in the PTG Plan and the SBC Plan during her period of employment with the Company and remains a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the Plans.  She remains a participant in the Plans because the SBC Plan has paid her only some of the benefits that the Plan acknowledges that it owes her:  *i.e.,* the Plan has yet to distribute certain benefits to her which the Plan (incorrectly) maintains must be distributed in the form of an annuity.  Plaintiff Lew also remains a participant in the SBC Plan apart from those acknowledged unpaid benefits because as a matter of law the SBC Plan owes her additional, unacknowledged benefits that it has not yet paid her, as set forth herein.  Neither the Plans nor the Company has clearly repudiated Plaintiff Lew's right to those additional unacknowledged benefits.  Ms. Lew was a participant in the PTG Plan on the date the PTG Plan was converted to a cash balance plan in 1996.

22.    Plaintiff Bradford J. Parsons is a current employee of the Company.  Mr. Parsons participated in the SNET Plan and currently participates in the SBC Plan from which he has not yet drawn a pension benefit.  He is a participant, as defined in ERISA § 3(7), 29 U.S.C. §1002(7), in the Plans and was a participant in the SNET Plan on the date the SNET Plan was converted to a cash balance plan in 1995.

23.    Defendant SBC Pension Benefit Plan is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35).

24.    As noted, the SBC Plan is the successor in interest to, among other plans, the Merged Plans, *i.e.,* the former PTG Plan, the former SNET Plan, and the former Ameritech

Plan. These Merged Plans also were at all relevant times "employee pension benefit plan[s]," and more specifically "defined benefit plan[s]," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35). As used herein, "Plan" refers to Defendant SBC Plan in its own right and/or as successor to the Merged Plans. "Plans" also refers to the SBC Plan in those regards but additionally refers to the former PTG Plan, the former SNET Plan and/or the former Ameritech Plans (the "Merged Plans") and those Plans' benefit formulas while they were in existence and/or are still to some degree operative.

25. SBC/AT&T is the sponsor of the Plan, the Plan's plan administrator and a named fiduciary of the Plan, within the meaning of ERISA §§ 3(16)(A)-(B), 402(a), 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a). *See, e.g.,* SBC Plan § 3.1.1(a).[2] SBC/AT&T also served in all those capacities as to the Merged Plans, following the Company's acquisition of their corporate sponsors, prior to those Plans' merger into the SBC Plan. SBC/AT&T is sued in all of these capacities.

26. As used herein, "SBC" refers to, among other things, all "SBC Participating Companies" and "Controlled Group Members" as those terms are used in the SBC Plan, as well as all predecessors, subsidiaries, affiliates, and subsidiaries and affiliates of all predecessors. "SBC" and the "Company" also refer, depending on context, to AT&T Inc. (also referred to herein as "SBC/AT&T").

---

[2] All citations to the "SBC Plan" are to the plan instrument governing the SBC Plan as restated through January 31, 2002 and as amended thereafter. This version of the SBC Plan, and the version of the SBC Plan as restated through February 1, 1995 and as amended thereafter -- as well as all versions of the Ameritech, SNET and PTG Plans in effect during the relevant time -- are incorporated herein by reference in their entirety, along with all plan instruments, writings or documents pertaining to the Plans.

## FACTS

### The SBC Plan's Traditional Formula

27.    The SBC Plan is a successor in interest to a number of defined benefit pension plans formerly maintained by Bell telephone companies.  SBC Plan § 1.2.

28.    The SBC Plan's immediate predecessor was the Southwestern Bell Corporation Management Pension Plan.  That plan was amended and restated as of May 1, 1992, to become the SBC Pension Benefit Plan – Nonbargained Program (also referred to as the "SBC Plan").  Prior to June 1, 1997, the SBC Plan calculated benefits by reference to a traditional pension formula.  The Plan promised any participant who terminated employment on or before June 1, 1997, and certain other specified participants, a monthly benefit payable at Normal Retirement Age (age 65) equal to 1.6% *times* Adjusted Career Income, divided by twelve.  SBC Plan § 4.2.1(a); *see also id.*, § 4.5.1(a).

29.    For example, an employee who had worked at the Company (and/or one or more of its predecessors) for 25 years and whose adjusted average salary during his career was $70,000 would be entitled to a monthly benefit commencing at age 65 equal to approximately 1.6% *times* (25 x $70,000) ÷ 12 = $2,333.33 per month, or $28,000 per year.  Various early retirement subsidies were available under the SBC Plan that may have allowed the participant to receive this annual benefit even before age 65 but this participant's "accrued benefit" under the SBC Plan for purposes of ERISA is $28,000 per year.

**The SBC Plan Adopts A Cash Balance Formula Effective June 1, 1997**

30.    Effective June 1, 1997, the Company converted the benefit formula under the SBC Plan from the traditional pension formula described above to a "cash balance" formula. SBC Plan § 4.2.1(a).

31.    Under the new cash balance formula, the SBC Plan established a hypothetical account in each participant's name.  The account was initially credited with an amount equal to what the Company informed employees was the "lump sum present value" of their approximate age-65 accrued benefit under the prior SBC Plan formula as of June 1, 1997, calculated using "1996 Pension Compensation" instead of Adjusted Career Income and using "legally required" conversion factors, which included an interest rate of 6.69% and the GATT mortality table.  *See* participant communication entitled *Introducing Cash Balance* at 5 and PB 11 (incorporated herein by reference); SBC Plan Supplement 2.4 ("S2.4").  This Opening Balance (which was guaranteed to be no less than $200) was thereafter credited with pay credits and interest credits, as described below.

32.    Beginning June 1, 1997 and continuing until January 2005 (when the cash balance formula was frozen, see below), each participant's account was increased each pay period by "Basic Benefit Credits" in an amount equal to 5% of each participant's compensation.  SBC Plan §§ 4.2.1(a)(2)(ii)-(a)(3).

33.    Participants' account balances also were credited each month with "Interest Credits" based on the SBC Plan's Monthly Interest Crediting Rate.  Plan § 4.2.1(a)(2)(iii).

34.     The Monthly Interest Crediting Rate for a particular month was defined as the monthly rate that, when compounded for 12 months, produces the published annual yield for 30-year Treasury bonds during the middle month of the previous quarter.  SBC Plan § 2.1.

**Grandfathered Employees And The Transition Benefit Under The SBC Plan**

35.     Most employees who were on the SBC payroll as of March 31, 1997 and still employees as of June 1, 1997 were classified as "Grandfathered Employees" entitled to an additional "Transition Benefit."

36.     According to an SBC participant communication, the Transition Benefit was calculated as follows:  "We estimate what your account balance would have been if you had been under the cash balance plan design for your whole career (your "Total Career" Account Balance), add in extra credits for age and service if appropriate (see page 6) and then subtract your Opening Balance.  The difference, your Transition Benefit, is paid with interest in monthly installments over five years, beginning in June, 1997."  *Introducing Cash Balance* at 5 and PB 11-13.

37.     SBC implemented the Transition Benefit formula by establishing a Transition Benefit Account ("TBA") for each Grandfathered Participant on the cash balance conversion date.  The TBA reflected the difference between the cash balance plan account balance each participant would have accrued had the cash balance formula always been in effect (the "always cash balance benefit")[3] and the participant's Opening Balance.  Thus, each Grandfathered Participant had two new accounts on the conversion date:  his regular cash balance account, credited with his Opening Balance, and his TBA, credited with the amount of his Transition Benefit.  The minimum opening balance in the TBA was set at $500.

38.    The extra age and service credits that were used to calculate the Transition

Benefit were as follows:

| Age + Service = Points | THEN add: |
| --- | --- |
| First 25 points | No age and service credits |
| > 25 up through 40 | 1% of "pay" (*i.e.*, 1996 Pension Compensation) for each point over 25 up through 40 |
| > 40 up through 50 | 15% of pay, plus 3% of pay for each point over 40 up through 50 |
| > 50 | 45% of pay, plus 5% of pay for each point over 50 |

39.    Under the terms of the Plan, transition credits for age and service could never

exceed 125% of pay.  *Introducing Cash Balance* at 6 and PB 12; SBC Plan S2.2.  The effect

of this limit was that age and point totals over 66 were not taken into account.

40.    This limit was age discriminatory on its face and in operation.  For example, a

participant who was age 40 could receive Transition Benefits based on all his years of service

with SBC, while a participant who was age 55 could receive Transition Benefits that

recognized, at most, 11 years of service.  While ERISA permits a plan to limit the number of

years of service that are taken into account under a plan, it does not permit a plan to impose a

service limit *that varies inversely with age*.

41.    Strikingly, the limit had the effect that many older Grandfathered Participants

would have been entitled to no Transition Benefits at all had it not been for the token $500

minimum guaranteed by the Plan – an amount which was merely cosmetic and wholly

inadequate to make up for the discriminatory nature of the Transition Benefit calculation.  The

fact that many older Grandfathered Participants received relatively small Transition Benefits

---

[3] The phraseology "always cash balance" is Plaintiffs' descriptive short-hand, not the name given by SBC.

was solely on account on their age: younger Grandfathered Participants with the same salary and years of service were awarded TBAs with balances worth thousands of dollars.

42.    Similar age discrimination occurred even with respect to participants whose service with SBC was fully reflected in the calculation of Transition Credits. Take the following example: Assume two participants who on May 31, 1997 were identical in every respect except for their age. Assume each participant had 1996 Pension Compensation of $50,000 and had worked for SBC for 10 years, with the only difference one participant was age 30 and the other was age 40.

43.    As of the date of conversion, these participants would have been treated as though each had accrued a benefit under the SBC Plan's traditional formula of $8,000 per year, payable commencing at age 65, the Plan's normal retirement age – *i.e.*, 1.6% *times* (10 x $50,000). An annual benefit of $8,000 commencing at age 65 and payable during the expected life of a participant has a lump sum value at age 65 of approximately $100,000 (assuming a typical annuity factor of 12.5).

44.    Using a discount rate of 6.69% (the rate used by the SBC Plan for purposes of the conversion), the corresponding Opening Balance for the 30-year-old participant would have been $10,367 – *i.e.*, the present value of $100,000 payable at age 65, which for a 30-year old would have been $100,000 $\div (1.0669)^{35} = $10,367. The corresponding Opening Balance for the 40-year-old participant would have been $19,811 – again, the present value of $100,000 payable at age 65, which for a 40-year-old would have been $100,000 $\div (1.0669)^{25}$ = $19,811.

45.     As explained above, the Transition Balance Account that would have been established for these two participants would have been the *excess of* the amount that would have been in their cash balance accounts had the SBC Plan always been a cash balance plan (the "always cash balance" amount) *plus* the extra age and service credits in the chart above, *over* the participants' Opening Balances.

46.     The always cash balance amount for both participants would have been approximately $22,000. (Under SBC's conversion assumptions, an employee making $50,000 in 1996 would have been paid approximately $34,000 upon his date of hire 10 years prior, with 4% pay increases thereafter. SBC also assumed cash balance credits would have accrued interest at 8%.)

47.     The extra age and service credits for the 30-year-old would have been $7,500, and the extra credits for the 40-year-old $22,500. *See* the age and service chart, supra ¶ 39.

48.     Putting these figures together, the Transition Account Balance for the 30-year-old participant would have been [$22,000 + $7,500] - $10,367 = **$19,133**. The TBA for the 40-year-old would have been [$22,000 + $22,500] - $19,811 = **$24,689**. The TBAs reflect new accruals, generally allocable over the 5-year period following the conversion date (though immediately, following death or disability), over and above the amount the two participants had already accrued under the SBC Plan: in other words, the TBAs reflected what can best be characterized as conversion-related "bonus accruals."

49.     While it is evident from the example that the 40-year-old was awarded a TBA credit that was *nominally* larger than the TBA credit awarded to the 30-year-old participant, this is irrelevant. The nominal TBA credits merely reflect the *present value* of the bonus

14

*accruals* in fact awarded to each participant. When the TBA credits are expressed in terms of annual benefits commencing at age 65 – which is the basis on which "*benefit accruals*" are tested for age discrimination under ERISA and the Internal Revenue Code – the relative values of the TBA credits are reversed.

50.     Expressed as an annual benefit commencing at age 65, the bonus accrual awarded to the 30-year-old is **$14,945** per year (*i.e.*, $19,367 x $(1.0669)^{35}$ ÷ 12.5 annuity factor); and the bonus accrual awarded to the 40-year-old is only **$9,970** per year (*i.e.*, $24,689 x $(1.0669)^{25}$ ÷ 12.5 annuity factor). In other words, when expressed in the form that ERISA and the Internal Revenue Code require, the 40-year-old was awarded a bonus accrual in connection with the conversion that was approximately one-third smaller than the bonus accrual that was awarded to the 30-year-old participant. The bonus accrual for the 40-year-old was smaller solely because he was older than the 30-year-old participant. For other participants, the disparity was even larger.

51.     To summarize, the net result of the 1997 amendment of the SBC Plan and the special grandfather and "always cash balance" transition rules was that for many younger SBC Grandfathered Employees, their accrued benefits under the SBC Plan were increased significantly in the 5 years following the date of conversion, because the sum of their opening cash balances plus Transition Benefits under the new cash balance formula was significantly more valuable than the benefit they had previously accrued under the SBC Plan's traditional formula.

52.     In contrast, employees that were similarly situated, though older, generally enjoyed much smaller increases in their benefits during the transition period – solely because

they were older.  This was the case even though the Transition Benefits were weighted based on age and service:  the weighting was not sufficient to offset the discriminatory impact of the conversion.  The discrimination occurred both on a nominal (or "present value") basis, as well as on the basis of the ERISA "accrued benefit" measured at age 65.  This was the case even taking into account the other transition and special benefits provided under the Plan, none of which were sufficient to overcome the discriminatory nature of the transition benefit formulas.

53.     As a result, the rate of benefit accrual under the SBC Plan in the 5-year period following the 1997 conversion to a cash balance plan was and is reduced for many participants in the Plan solely on account of their age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Internal Revenue Code ("Tax Code") § 411(b)(1)(H).

54.     This age discrimination has deprived Plaintiffs and other members of the proposed Class (defined more fully below) of benefits to which they were and are entitled by law.  It has also deprived them of their statutory right, as ERISA plan participants, to participate in a retirement plan compliant with law.

**The Former Ameritech Plan**

55.     Prior to May 1, 1995, the Ameritech Management Pension Plan (the "Ameritech Plan") had a traditional pension benefit formula which was substantially similar to the SBC Plan's traditional benefit formula, except that the benefit multiplier was 1.4% for most participants instead of 1.6% as under the SBC Plan.  Ameritech Plan SPD, February 2002 ("2002 Ameritech Plan SPD") at Appendix B.  Effective May 1, 1995, Ameritech

16

amended the Ameritech Plan to convert the plan's benefit formula to a "pension equity"

formula (referred to in the plan as a "Defined Lump Sum" or "DLS").

56.    Under the Ameritech Plan's pension equity formula, a participant's benefit was

equal to a benefit with a lump sum present value equal to his accumulated pension credits

*times* his final average pay (as defined under the Ameritech Plan).  Accumulated pension

credits were calculated as the sum of a participant's monthly pension credits, which were

based on the participant's age in the month each credit was received pursuant to the following

chart (the first two columns of which are from the Plan):[4]

| Age During the Month | Pension Credit Rate | Equivalent Age-65 Accrual Rate |
|---|---|---|
| Under age 30 | 6 % | 8.3 % |
| 30-34 | 7 % | 5.4 % |
| 35-39 | 8 % | 4.6 % |
| 40-44 | 10 % | 4.3 % |
| 45-49 | 12 % | 3.8 % |
| 50-54 | 15 % | 3.6 % |
| Age 55 and over | 20 % | 3.6 % |

2002 Ameritech Plan SPD at 9.

57.    Participants in the Ameritech Plan who were employed by Ameritech on May

1, 1995 ("Grandfathered Ameritech Employees") were covered by special transition rules.

Under these transition rules, each Grandfathered Ameritech Employee was entitled to a DLS

---

[4] The third column reflects Plaintiffs' calculations for a participant at the lowest end of each age band (age 20 for the "under 30" band), assuming an interest rate of 6% for purposes of projecting benefits to age 65.

benefit calculated as if the employee had been covered by the DLS pension formula from his date of hire, not just for periods after May 1, 1995.

58.     Under this opening DLS benefit calculation, many younger employees received an immediate increase in their accrued benefits under the Ameritech Plan, because the "always DLS" benefit[5] was larger than the benefit they had accrued under the Ameritech Plan's traditional pension formula.  In contrast, the "always DLS" benefit for many similarly situated, though older participants was less than the benefit they had already accrued under the Ameritech Plan.  As a result, these participants did not receive an immediate increase in their accrued benefit on the date of the Ameritech Plan's conversion to a pension equity plan – with the only reason for the distinction being that these participants were older.  The impact of the pension equity plan conversion under the Ameritech Plan was even more pronounced than the cash balance conversion under the SBC Plan, because participants did not receive transition benefits (such as the SBC Plan Transition Benefits) that were designed to at least partially offset the discriminatory impact of the conversion on older, longer service employees.

59.     As a result, the rate of benefit accruals under the Ameritech Plan in the year of conversion was reduced for some participants solely on account of their age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H).  This is true whether benefits are measured on a nominal basis or on the basis of the corresponding annual benefit commencing at age 65.

60.     This age discrimination has deprived Plaintiffs and other members of the proposed Class (defined more fully below) of benefits to which they were and are entitled by

law.  It has also deprived them of their statutory right, as ERISA plan participants, to participate in a retirement plan compliant with law.

61.     SBC acquired Ameritech Corporation in 1999 and continued to maintain the Ameritech Plan as a separate plan for several years.  Effective December 31, 2004, the Ameritech Plan was merged into the SBC Plan.  Effective January 15, 2005, most of the Ameritech Plan's separate features were eliminated in connection with the plan's consolidation into the SBC Plan.  At that time, each participant's DLS benefit was frozen and converted into a cash balance account.  Interest credits (but not pay credits) continue to accrue on such accounts until benefits are fully distributed.

**The SBC Plan's And The Former Ameritech Plan's New CAM Benefit - 2001**

62.     Effective as of June 14, 2001, SBC amended the SBC Plan and the Ameritech Plan to provide that each participant who terminated employment after June 13, 2001 would be entitled to a benefit that was equal to the greater of his benefit accrued under the cash balance or pension equity formulas under those plans or a new minimum monthly benefit, the Career Average Minimum or "CAM Benefit," payable at Normal Retirement Age.

63.     The CAM Benefit is equal to one-twelfth of 1.6% of each participant's CAM Income.  CAM Income is calculated in a manner similar to the way Adjusted Career Income was determined for purposes calculating benefits under the traditional formula described above.  SBC Plan Supplement 12: CAM Benefits; Ameritech Plan, CAM Benefits.

64.     Net CAM Benefits (*i.e.*, CAM Benefits that exceeded a participant's cash balance or pension equity benefit) that were less than $400 per month could be received in the form of a single lump sum distribution.  However, when the net CAM Benefit crossed the

---

[5] The phraseology "always DLS" is Plaintiffs' descriptive short-hand, not the name given by Ameritech.

"CAM Excess Limit" threshold of $400 per month, participants were no longer entitled to receive their net CAM Benefits in the form of a single lump sum.  SBC Plan S.12.3; Ameritech Plan, CAM Benefits.

65.    For participants in the SBC Plan (including participants who previously had been in one of the Merged Plans), the combined effect of the cash balance formula and the new "greater-of" CAM formula adopted as of June 14, 2001, was that the regular or "basic" (*i.e.*, non-transition) benefit accrued by participants in the SBC Plan between June 1, 1997 and June 13, 2001 (or for employees hired after March 31, 1997, between April 1, 1997 and June 13, 2001, *Introducing Cash Balance* at 4) was an amount determined under the cash balance formula; and for the period between June 14, 2001 and January 14, 2005 (the date the cash balance formula was frozen, see below), the benefit was equal to the greater of the benefit accrual determined under the cash balance formula or the accrual under the traditional pension formula (either in the form of grandfathered benefits or CAM benefits).

66.    For participants in the Ameritech Plan, the combined effect of the pension equity "DLS" formula and the new CAM "greater-of" formula adopted as of June 14, 2001, was that the regular or "basic" (*i.e.*, non-transition) benefit accrued by participants  in the Ameritech Plan between May 1, 1995 and June 13, 2001 was the DLS benefit; and for each period between June 14, 2001 and January 14, 2005 (the date the pension equity formula was frozen, see below) the benefit was an amount equal to the greater of the benefit accrual determined under the DLS formula or the accrual under the traditional pension formula (either in the form of grandfathered benefits or CAM benefits).

67.     Under both Plans, this meant that benefits under the basic cash balance formula (in the case of the SBC Plan) and the basic pension equity formula (in the case of the Ameritech Plan) accrued at an annual rate that was higher for younger participants than for similarly-situated, though older participants.  As a result, both Plans violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), which prohibits a plan from reducing the rate of benefit accruals under the plan because of age or the attainment of any age.  This was the case even taking into account the various transition and other special benefits provided under the Plans, none of which were sufficient to overcome the discriminatory nature of the basic benefit formulas.

68.     This discrimination becomes evident when benefit accruals under each Plan are measured based on the rate at which normal retirement benefits accrue under the Plans.  This is the basis upon which benefit accruals must be tested under ERISA's and the Tax Code's age discrimination rules, not the rate at which pay credits nominally are allocated.

69.     For example, take a cash balance credit under the SBC Plan's basic benefit formula equal to 5% of current pay.  When such a credit was allocated to the cash balance "account" of a 30-year-old employee, the employee was considered (under ERISA and the Tax Code) at that moment to have accrued the right to receive an annual benefit commencing at age 65 equal to approximately 3.2% of his pay – this is the benefit he accrued as a result of the 5% pay credit.[6]  For a 50-year-old employee, on the other hand, the same 5% of pay current allocated to the employee's "account" was treated as though the employee at that

_____

[6] The math for the 30-year-old employee is [5% x $(1.06)^{35}$] ÷ 12 = 3.2%.  For the 50-year-old, the math is [5% x $(1.06)^{15}$] ÷ 12 = 0.1%.  The calculations assume a 30-year Treasury bond rate of 6% and a typical annuity factor of 12.  The exponents reflect the period over which each participant's pay credit will accrue interest from the date of the credit through each participant's normal retirement age under the SBC Plan, which is age 65.

moment accrued the right to receive an annual benefit commencing at age 65 equal to only 0.1% of pay. The rate was significantly lower for the 50-year-old employee solely on account of his age.

70.     If the 50-year-old employee was covered under the "greater-of" CAM formula, the discrimination would not have been as pronounced, but it would have remained significant. Under the greater-of formula, the 50-year-old employee would have accrued the right to receive an annual benefit at age 65 under the SBC Plan equal to approximately 1.6% of his pay – *i.e.*, the greater of 0.1% under the basic cash balance formula and 1.6% under the CAM formula. Under other special benefit provisions, the employee's benefit might have been further increased. However, neither the CAM minimum nor any of the special benefits were sufficient to bring the older employee's age-65 rate of benefit accrual to the level of the younger employee's rate of accrual (*i.e.*, 3.2% in the example).

71.     A similar result occurred under the Ameritech basic formula. Under the Ameritech Plan, a 30-year old employee earned a nominal DLS benefit equal to 7% of his current pay. Using the same assumptions from the SBC examples above, the 30-year-old employee was considered at that moment to have accrued the right to receive an annual benefit commencing at age 65 equal to approximately 5.4% of his pay – this is the benefit he accrued as a result of the 7% DLS credit. A 50-year employee, on the other hand, who earned a nominal DLS benefit equal to 15%, was treated as accruing an age-65 annual benefit equal to only 3.6% of pay. *See* Ameritech pension credit chart above. The difference in benefit accrual rates – 5.4% for the 30-year-old employee and 3.6% for the 50-year-old employee – was based solely on the fact that the 50-year-old employee was older than the 30-year-old.

Any increases attributable to the CAM minimum or other special benefits were insufficient to offset the discriminatory nature of the basic DLS formula.

72.      Plaintiffs and other members of the proposed class were adversely affected by the age discrimination alleged and illustrated in the examples above and were directly harmed as a result.  Each named Plaintiff and member of the proposed class also were directly harmed because they participated in a retirement plan that did not fully comply with ERISA and the Tax Code in the manner described.

**2005 Freeze Of The SBC Plan's Cash Balance Formula**

73.      Effective as of January 14, 2005, SBC amended the SBC Plan (which by that time had absorbed the Ameritech Plan) to provide that Basic Benefit Credits and pension equity credits would no longer be made under the Plans' cash balance and pension equity formulas.  *See* SBC Communications Inc. SEC Form Def 14A filed March 11, 2005 at 51.

74.      Notwithstanding this action, interest credits continue to be credited to existing participant's cash balance accounts, including cash balance accounts that had been formed as a way to preserve the value of benefits that had been accrued under the Ameritech pension equity benefit formula.  In other words, accrued cash balance (and converted pension equity) benefits were frozen and henceforth "will not increase except with interest."  *See* "Understanding Your Pension Benefit," at 2, SBC participant communication, March 2005.

**The Former PTG Plan**

75.      Effective July 1, 1996, PTG converted the traditional pension formula under the PTG Plan to a cash balance formula.  The cash balance formula under the PTG Plan was

substantially similar to the cash balance formula under the SBC Plan. *See Introducing Cash Balance* at 1.

76.    Under the PTG Plan, each employee with an accrued benefit under the PTG Plan at the time of the conversion was credited with an opening cash balance amount approximately equal to the balance the employee would have earned had the cash balance formula been in place since the employee's date of hire by PTG. *See* SBC Summary Plan Description dated March 1999 ("1999 SPD") at PB 10; PTG SPD at 10.

77.    Each PTG employee who had been a participant in the PTG Plan between March 22, 1996 and June 30, 1996 ("Grandfathered PTG Employee") also was promised an Accelerated Transition Benefit ("ATB"). The ATB was a traditional pension benefit payable monthly at age 65 equal to 2% of each eligible employee's average monthly compensation from July 1, 1991 to June 30, 1996 *times* the employee's years of service with PTG as of June 30, 1996. (Later, participants eligible for an ATB who were still employed as of January 1, 1999, became entitled to a "Special ATB" that preserved the value of the ATB accrued as of January 1, 1999 for up to an additional two years.)

78.    Each Grandfathered PTG Employee, moreover, was guaranteed a pension benefit no less valuable than his or her accrued benefit under the PTG Plan as of the date the PTG Plan was converted to a cash balance Plan, as required under ERISA. 1999 SPD at PB 25.

79.    The net result of the 1996 amendment of the PTG Plan and the special grandfather rules was that for many younger Grandfathered PTG Employees, their accrued benefit under the PTG Plan was increased significantly on the date of conversion, because

their opening cash balance accounts were more valuable than the benefit they had previously accrued under the PTG Plan's traditional formula. In other words, many younger participants enjoyed significant one-time benefit accruals under the PTG Plan on the cash balance conversion date.

80. In contrast, employees that were similarly situated, though older, generally enjoyed smaller one-time increases in their accrued benefit under the PTG Plan. This occurred in a similar manner and for similar reasons that the conversions of the SBC and Ameritech Plans to cash balance and pension equity plans, respectively, resulted in larger one-time (or short-term) benefit accruals for younger employees than for similarly situated older employees. *See* SBC and Ameritech allegations and examples above regarding the age discrimination associated with the "always cash balance" and "always DLS" conversion methodologies, *supra* ¶¶ 36-53. The impact of the cash balance conversion was even more pronounced under the PTG Plan than under the SBC Plan because participants did not receive transition benefits (such as the SBC Plan Transition Benefits) that were designed to at least partially offset the discriminatory impact of the conversion on older, longer service employees.

81. As a result of the PTG Plan's "always cash balance" conversion method, the rate of benefit accruals under the PTG Plan in the year of conversion was reduced for some participants solely on account of age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H). This is true whether benefits are measured on a nominal basis or on the basis of the corresponding annual benefit commencing at age 65.

82.    The PTG Plan discriminated based on age in another way as well.  Benefits under the PTG Plan's regular cash balance formula accrued at an annual rate that was higher for younger participants than for similarly-situated, though older participants in the same manner that the SBC Plan's basic cash balance formula did:  when benefit accruals under the PTG Plan are measured based on the rate at which normal retirement benefits accrue under the Plan, the rate of accrual is reduced solely on account of the increasing age of participants. *See supra* ¶ 67-69.  This discrimination occurred even taking into account the effect of the "greater-of" ATB and Special ATB formulas – for the same reasons that the SBC Plan's basic benefit formula discriminated even taking into account the "greater-of" CAM benefit.  *See supra* ¶ 70.

83.    As a result, the PTG Plan's regular cash balance benefit formula violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), which prohibits a plan from reducing the rate of benefit accruals under the plan because of age or the attainment of any age.

84.    This age discrimination has deprived Plaintiffs and other members of the proposed Class (defined more fully below) of benefits to which they were and are entitled by law.  It has also deprived them of their statutory right, as ERISA plan participants, to participate in a retirement plan compliant with law.

85.    On April 1, 1997, SBC acquired PTG and thereupon became the PTG Plan's sponsor, plan administrator and a named fiduciary.  Initially, the PTG Plan was maintained by SBC as a separate plan.  On January 1, 1999, SBC merged the PTG Plan into the SBC Plan.

Following the plan merger, former participants in the PTG Plan became participants in the SBC Plan and began to accrue benefits under the basic SBC cash balance formula.

**The Former SNET Plan**

86.    Effective as of January 1, 1996, SNET converted the SNET Plan's traditional pension formula to a cash balance formula. The terms of the SNET Plan and that Plan's summary plan descriptions are incorporated by reference herein.

87.    Under the SNET Plan's cash balance formula, each participant's opening balance was equal to the present value (as determined by the Plan) of the participant's accrued benefit under the traditional pension formula as of the date of conversion. This opening balance was thereafter credited with pay credits and interest credits.

88.    The amount of a participant's Basic Pay Credits varied based on a participant's combined years of age and service. The formula also provided Supplemental Pay Credits if a participant's actual pay was greater than 80% of the Social Security wage base. Interest Credits also were awarded each month at a rate stated under the plan.

89.    The SNET Plan's cash balance benefit formula discriminated based on age. Benefits under the SNET Plan's regular cash balance formula accrued at an annual rate that was higher for younger participants than for similarly-situated, though older participants, in the same manner that the SBC Plan's and PTG's Plans basic cash balance formulas did: when benefit accruals under the SNET Plan are measured based on the rate at which normal retirement benefits accrue under the Plan, the rate of accrual is reduced solely on account of the increasing age of participants. *See supra* ¶¶ 67-70, 82. This violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and

Tax Code § 411(b)(1)(H), which prohibits a plan from reducing the rate of benefit accruals under the plan because of age or the attainment of any age.

90.     This age discrimination has deprived Plaintiffs and other members of the proposed Class (defined more fully below) of benefits to which they were and are entitled by law.  It has also deprived them of their statutory right, as ERISA plan participants, to participate in a retirement plan compliant with law.

91.     SBC acquired SNET in 1998 and thereupon become the SNET Plan's sponsor, administrator and a named fiduciary.  SBC initially maintained the SNET Plan as a separate plan.

92.     Effective January 1, 2000, SBC merged the SNET Plan into the SBC Plan. During the year 2000, under the SBC Plan, former SNET Plan participants continued to earn monthly Basic Pay Credits and Supplemental Pay Credits calculated using the former SNET Plan's cash balance formula.

93.     Effective January 1, 2001, these participants began earning Basic Pay Credits as under the SBC Plan's formula of 5% of actual pay (called "Basic Benefits" under the SBC Plan instead of "Basic Pay Credits" as under the SNET Plan).  Also effective January 1, 2001, Supplemental Pay Credits were discontinued.

94.     For SNET employees hired or rehired in 2000, the SBC Plan's formula of 5% of actual pay (Basic Benefits) was employed.

95.     After the merger of the SNET Plan into the SBC Plan, each participant was entitled to a benefit calculated as the greatest of the following three amounts: (1) the participant's account balance as of December 31, 1999, plus interest at 3% per year; (2) the

participant's account balance as of December 31, 1999, projected to age 65 using an assumed interest rate of 3% per year and converted to an annuity payable at age 65; or (3) the benefit calculated under the SBC Plan.

## CLAIMS FOR RELIEF

## COUNT ONE

### AGE DISCRIMINATION UNDER THE SBC PLAN'S TRANSITION BENEFIT FORMULA

96.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

97.     Plaintiffs bring this claim on behalf of themselves and members of the proposed SBC Transition Benefit Account ("TBA") Class.

98.     As described above, the manner in which participants' TBAs were calculated under the SBC Plan upon conversion of the Plan to a cash balance plan on June 1, 1997, discriminated against older participants solely on account of their age.  The discrimination occurred on a nominal (or present value) basis, as well as on the basis of the ERISA "accrued benefit" measured at age 65, which is the SBC Plan's normal retirement age.

99.     As a result, the rate of benefit accrual under the SBC Plan during the 5-year period following its June 1, 1997, conversion to a cash balance plan was reduced for many participants in the Plan solely on account of their age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H).

100.     As a result of the violations described in this Count, Plaintiffs and other participants under the Plans accrued benefits during the cash balance period that were smaller than the benefits they would have accrued had the Plans complied with ERISA and Tax Code

29

age discrimination standards. Each named Plaintiff and member of the proposed class also were directly harmed because they participated in a retirement plan that did not fully comply with ERISA and the Tax Code in the manner described.

## COUNT TWO

### AGE DISCRIMINATION UNDER THE AMERITECH PLAN'S OPENING DLS BENEFIT FORMULA

101.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

102.    Plaintiffs bring this claim on behalf of themselves and members of the proposed Ameritech Opening DLS Benefit Class.

103.    As described above, the manner in which participants' Opening DLS Benefits were calculated under the Ameritech Plan upon conversion of the Plan to a pension equity plan on May 1, 1995, discriminated against older participants solely on account of their age. The discrimination occurred on a nominal (or present value) basis, as well as on the basis of the ERISA "accrued benefit" measured at age 65, which is the Ameritech Plan's normal retirement age.

104.    As a result, the rate of benefit accrual under the Ameritech Plan in the year the Plan was converted to a pension equity plan was reduced for many participants in the Plan solely on account of their age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H).

105.    As a result of the violations described in this Count, Plaintiffs and other participants under the Plans accrued benefits during the cash balance period that were smaller than the benefits they would have accrued had the Plans complied with ERISA and Tax Code

age discrimination standards. Each named Plaintiff and member of the proposed class also were directly harmed because they participated in a retirement plan that did not fully comply with ERISA and the Tax Code in the manner described.

<u>**COUNT THREE**</u>

**AGE DISCRIMINATION UNDER THE PTG PLAN'S**
**<u>OPENING CASH BALANCE ACCOUNT FORMULA</u>**

106.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

107.    Plaintiffs bring this claim on behalf of themselves and members of the proposed PTG Opening Cash Balance Account Class.

108.    As described above, the manner in which participants' Opening Cash Balance Accounts were calculated under the PTG Plan upon conversion of the Plan to a cash balance plan on July 1, 1996, discriminated against older participants solely on account of their age. The discrimination occurred on a nominal (or present value) basis, as well as on the basis of the ERISA "accrued benefit" measured at age 65, which is the PTG Plan's normal retirement age.

109.    As a result, the rate of benefit accrual under the PTG Plan in the year the Plan was converted to a cash balance plan was reduced for many participants in the Plan solely on account of their age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H).

110.    As a result of the violations described in this Count, Plaintiffs and other participants under the Plans accrued benefits during the cash balance period that were smaller than the benefits they would have accrued had the Plans complied with ERISA and Tax Code

age discrimination standards.  Each named Plaintiff and member of the proposed class also were directly harmed because they participated in a retirement plan that did not fully comply with ERISA and the Tax Code in the manner described.

## COUNT FOUR

### AGE DISCRIMINATION UNDER THE PLANS' ONGOING CASH BALANCE AND PENSION EQUITY FORMULAS

111.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

112.    Plaintiffs bring this claim on behalf of themselves and members of the proposed Class.

113.    After the SBC Plan and each of the Merged Plans were amended to add cash balance or pension equity formulas, and through June 14, 2005 when the cash balance and pension equity formulas were frozen, participants in the Plans accrued benefits in whole or part under the cash balance or pension equity formulas under the Plans.

114.    The rate at which benefits accrued under the Plans during this period was in many cases larger for younger employees than for similarly situated older employees.  As a result, each of the Plans violated the age discrimination standard set forth in ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and Tax Code § 411(b)(1)(H), which makes it unlawful for a defined benefit pension plan to reduce the rate at which benefits accrue because of age or the attainment of any age.

115.    As a result of the violations described in this Count, Plaintiffs and other participants under the Plans accrued benefits during the cash balance period that were smaller than the benefits they would have accrued had the Plans complied with ERISA and Tax Code

age discrimination standards.  Each named Plaintiff and member of the proposed class also were directly harmed because they participated in a retirement plan that did not fully comply with ERISA and the Tax Code in the manner described.

## COUNT FIVE

### UNLAWFUL FORFEITURE OF LUMP SUM DISTRIBUTION OPTION UNDER THE SBC PLAN ON ACCOUNT OF INCREASING SERVICE

116.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

117.    Plaintiffs bring this claim on behalf of themselves and members of the proposed Lump Sum Forfeiture Class.

118.    When the amount of the net CAM Benefit accrued by participants under the SBC Plan and Ameritech Plan crossed the CAM Excess Limit threshold of $400 per month, SBC Plan and Ameritech Plan participants were no longer entitled to receive their net CAM Benefits in the form of a single lump sum distribution.

119.    This resulted in a violation of the age discrimination standard set forth in ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), and Tax Code § 411(b)(1)(G), which makes it unlawful for a plan to reduce a participant's accrued benefit because of increasing service.

120.    A participant's right to receive the amount of his or her accrued benefit in the form of a lump sum is an integral part of the "accrued benefit."  As the Supreme Court recognized in *Central Laborers Pension Fund v. Heinz*, 124 S. Ct. 2230, 2235-36 (2004) (internal quotes omitted), "as a matter of common sense, [a] participant's benefits cannot be understood without reference to the conditions imposed on receiving those benefits, and an

amendment placing materially greater restrictions on the receipt of the benefit 'reduces' the benefit just as surely as a decrease in the size of the monthly benefit payment."

121.    By stripping participants of the right to take their net CAM Benefits as an immediate lump sum merely because the participants continue to work and accrue benefits that put them over the $400 CAM Excess Limit, the Plans unlawfully reduced participants' accrued benefits solely on account of increased service.

122.    As a result of the violations described in this Count, Plaintiff Lew and participants in the Plans whose net CAM Benefit amount crossed the CAM Excess Limit threshold of $400 were unlawfully denied benefits that they would have been entitled to had the Plans complied with ERISA and Tax Code age discrimination standards.

## **CLASS ACTION ALLEGATIONS**

123.    Plaintiffs bring suit on behalf of themselves and on behalf of all other participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein.

124.    The proposed Class is defined as follows:[7]

All persons who participated in the SBC Pension Benefit Plan (also known at times as the SBC Pension Benefit Plan – Nonbargained Program) at any time after May 31, 1997, the SNET Management Pension Plan at any time after December 31, 1995, the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees at any time after June 30, 1996, and/or the Ameritech Management Pension Plan at any time after April 30, 1995; and the beneficiaries and estates of such persons, but excluding persons who did not participate in the SBC Pension Benefit Plan until after January 14, 2005.

---

[7] The proposed Class and Subclass definitions are without prejudice to Plaintiffs' right to propose a broader or narrower class and/or additional classes and/or Subclasses following discovery.

The following Subclasses also are proposed:

- SBC Transition Benefit Account ("TBA") Subclass:

    All persons who participated in the SBC Pension Benefit Plan – Nonbargained Program on June 1, 1997, and the beneficiaries and estates of such persons. (*See* Count One).

- Ameritech Opening DLS Benefit Subclass:

    All persons who participated in the Ameritech Management Pension Plan on May 1, 1995, and the beneficiaries and estates of such persons. (*See* Count Two).

- PTG Opening Cash Balance Account Subclass:

    All persons who participated in the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees on July 1, 1996, and the beneficiaries and estates of such persons. (*See* Count Three).

- Lump Sum Forfeiture Subclass:

    All persons who participated in the SBC Pension Benefit Plan – Nonbargained Program and/or the Ameritech Management Pension Plan at any time after June 13, 2001, and the beneficiaries and estates of such persons. (*See* Count Five).

125.    The requirements for maintaining this action as a class action under Fed. R. Civ. P. 23(a) are satisfied in that there are too many Class members for joinder of all of them to be practicable. There are tens of thousands of members of the proposed Class and thousands of members of each of the proposed Subclasses dispersed among many states.

126.    The claims of the Class members raise numerous common questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2). Every issue or nearly every issue concerning liability is common to all Class members or Subclass members because such issues concern their entitlement to benefits calculated in a manner other than that calculated thus far and their entitlement to relief from harm caused by the violations of

law, rather than any action taken by Plaintiffs or any Class member.  In addition, every issue or nearly every issue concerning relief is also common to the Class or Subclass for the same reason.

127.    Plaintiffs' claims are typical of the claims of the Class and Subclass members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3).  They do not assert any claims in addition to or different than those of the Class or Subclasses.

128.    Plaintiffs are adequate representatives of the Class and the Subclasses of which they are members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are identical to those of the Class and the Subclass of which they are members.  Defendants have no unique defenses against them that would interfere with their representation of the Class or the Subclasses.  Plaintiffs have engaged counsel with considerable ERISA class action litigation experience.

129.    Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the Class or the Subclasses would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

130.    Alternatively, all of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that Defendants' actions affected all Class and Subclass members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class and the Subclasses as a whole.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants and that the Court award the following relief:

A.    Certification of this action as a class action for all purposes of liability and relief and appointment of undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23;

B.    Judgment for Plaintiffs and the Class and Subclasses against Defendants on all claims expressly asserted and/or within the ambit of this Complaint;

C.    An order awarding, declaring or otherwise providing Plaintiffs and the Class and the Subclasses all other such relief to which Plaintiffs and the Class and Subclasses are or may be entitled whether or not specified herein.

The relief Plaintiff seeks includes but is not limited to:

D.    An order declaring that Defendants violated and are violating ERISA's accrued benefit standards in the specific manners alleged in this Complaint and in such other manners as Plaintiffs shall demonstrate to the Court's satisfaction;

E.    An order enjoining Defendants from continuing to violate the law in the manners alleged or referenced in this Complaint or hereafter proven.

F.    An order reforming the Plan and/or compelling SBC/AT&T to reform the Plan and/or compelling Defendants to bring the terms and administration of the Plan into compliance with ERISA, in all cases effective as of the date the alleged violations first occurred;

G.    Following entry of other predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to re-

calculate the benefit amounts due under the terms of the Plan in accordance with the

requirements of ERISA, and for the Plan to pay the difference, plus interest, to or on behalf of

all Class and Subclass members who received less in benefits or benefit accruals than the

amount to which they are entitled and/or to pay benefits to which Class and Subclass

members are entitled in all applicable optional forms (such as lump sum distributions);

      H.    An order awarding pre- and post-judgment interest.

      I.    An order awarding attorney's fees on the basis of the common fund doctrine

(and/or other applicable law, at Plaintiffs' election), along with the reimbursement of the

expenses incurred in connection with this action.

      J.    An order awarding, declaring or otherwise providing Plaintiffs all relief under

ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiffs may

subsequently specify and/or that the Court may deem appropriate.


Dated:  January 31, 2006        By:


                  ___ s/Eli Gottesdiener
                  Eli Gottesdiener (D.C. Bar No. 420764)
                  **GOTTESDIENER LAW FIRM, PLLC**
                  1025 Connecticut Avenue, N.W.
                  Suite 1000
                  Washington, D.C.  20036
                  Phone: (202) 243-1000
                  Fax:    (202) 243-1001

                  Attorney for Plaintiffs and the proposed Class and
                  Subclasses

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2006, I caused a copy of the foregoing First

Amended Class Action Complaint to be served upon Defendants through their counsel in this

matter as follows:

### BY HAND

Charles D. Tetrault
Vinson & Elkins, LLP,
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-1008

### BY OVERNIGHT MAIL

John L. Carter
Vinson & Elkins, LLP
2300 First City Tower
1001 Fannin St.
Houston, Texas 77002-6760


  s/Eli Gottesdiener
Eli Gottesdiener