# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
)
**REED J. NEWLIN, OCTAVIA** )  <u>**ORAL HEARING REQUESTED**</u>
**KINCHLOE, DOREEN J. LEW,** )
**and BRADFORD J. PARSONS,** )
)
        **Plaintiffs,** )
) **Civil Action No. 05-01939-CKK**
**v.** )
) **(Judge Kollar-Kotelly)**
**SBC PENSION BENEFIT PLAN and** )
**AT&T INC.,** )
)
        **Defendants.** )
———————————————————— )

## DEFENDANTS' MOTION TO DISMISS OR TRANSFER

Defendants SBC Pension Benefit Plan (n/k/a AT&T Pension Benefit Plan) (the "Plan")

and AT&T Inc. move as follows:

1.      Pursuant to Rule 12, Defendants move to dismiss this case (i) for lack of personal

jurisdiction and (ii) because venue is improper in this district.  In the alternative, Defendants

move, pursuant to 28 U.S.C. § 1404(a), to transfer this case to the Western District of Texas, San

Antonio Division, where the case could have been brought because both Defendants are

headquartered in that district and the Plan is administered there.

2.      Subject to their jurisdictional and venue motion, Defendants also move under

Rule 12(b)(6) to dismiss Plaintiffs' complaint for failure to state a claim upon which relief can be

granted.

3.      In support of their motion, Defendants submit the accompanying memorandum of points and authorities and the affidavits of Hannah Patterson, Liaw Huang, and Starlene Meyerkord.

4.      Pursuant to ¶ 9 of the Court's October 7, 2005 Order, no proposed order is submitted with this motion.  As required by ¶ 4 of that Order, courtesy copies of this motion and the supporting brief and affidavits will be hand delivered to Chambers.

5.      Defendants request an oral hearing on this motion.


                                          ___/S/  Charles D. Tetrault_____
OF COUNSEL:                               Charles D. Tetrault (D.C. Bar No. 926527)
John L. Carter                            Vinson & Elkins L.L.P.
Miriam M. Burke                           Willard Office Building
Vinson & Elkins L.L.P.                    1455 Pennsylvania Avenue, N.W.
1001 Fannin, Suite 2300                   Washington, D.C.  20004-1008
Houston, Texas  77002-6760                Telephone:  (202) 639-6551
                                          Facsimile:   (202) 639-6604
Javier Aguilar                            ctetrault@velaw.com
Geoffrey Amsel
AT&T Services, Inc.
175 E. Houston, 4th Floor
San Antonio, Texas  78205


**_Attorneys for Defendants SBC Pension Benefit Plan and AT&T Inc._**


March 10, 2006


555373_1.DOC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| REED J. NEWLIN, OCTAVIA KINCHLOE, DOREEN J. LEW, and BRADFORD J. PARSONS, | ) ) ) ) | **ORAL HEARING REQUESTED** |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-01939-CKK |
| SBC PENSION BENEFIT PLAN and AT&T INC., | ) ) ) ) | (Judge Kollar-Kotelly) |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION (1) TO DISMISS FOR LACK OF PERSONAL JURISDICTION
## OR VENUE, (2) TO TRANSFER VENUE, AND (3) TO DISMISS
## FOR FAILURE TO STATE A CLAIM

OF COUNSEL:
John L. Carter
Miriam M. Burke
VINSON & ELKINS L.L.P.
2300 First City Tower
Houston, Texas 77002-6760

Javier Aguilar
Geoffrey Amsel
AT&T Services, Inc.
175 E. Houston, 4th Floor
San Antonio, Texas  78205

Charles D. Tetrault (D.C. Bar No. 926527)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-1008
Telephone:  (202) 639-6551
Facsimile:  (202) 639-6604
ctetrault@velaw.com

ATTORNEYS FOR DEFENDANTS SBC PENSION BENEFIT PLAN AND AT&T INC.

March 10, 2006

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................................... 2

I.   THE COURT LACKS PERSONAL JURISDICTION OVER THE
     DEFENDANTS ............................................................................................ 2

     A.   Defendants Do Not Have Sufficient Contacts For "General Jurisdiction" ............. 3

     B.   There Is No "Specific Jurisdiction" In This Case ...................................... 4

     C.   ERISA's Nationwide Service Of Process Does Not Confer Personal
          Jurisdiction ..................................................................................... 5

II.  VENUE IS IMPROPER IN THE DISTRICT OF COLUMBIA ...................................... 7

     A.   The Breach Did Not Occur In The District Of Columbia ............................... 7

     B.   Defendants Are Not Found In The District Of Columbia .............................. 9

     C.   Defendants' Residence In The Western District Of Texas Does Not
          Establish Venue In The District Of Columbia .......................................... 10

III. IF NOT DISMISSED, THE CASE SHOULD BE TRANSFERRED TO WHERE
     THE PLAN IS ADMINISTERED ...................................................................... 12

     A.   Standards For Section 1404(a) Transfer ............................................... 12

     B.   Application Of The 1404(a) Factors ...................................................... 14

          1.   Plaintiffs' choice of forum. .......................................................... 14

          2.   Defendants' choice of forum. ....................................................... 17

          3.   Claims arise elsewhere. ............................................................... 18

          4.   Convenience of parties. .............................................................. 19

          5.   Convenience of witnesses. ........................................................... 19

          6.   Location of books and records and access to sources of proof. .......... 20

          7.   Docket congestion. .................................................................... 20

          8.   Familiarity with applicable law. .................................................... 21

          9.   Local interest in deciding the controversy. ..................................... 21

          10.  Other practical aspects. .............................................................. 22

IV.  IN ANY EVENT, THE COMPLAINT FAILS TO STATE A CLAIM UPON
     WHICH RELIEF CAN BE GRANTED ............................................................... 23

     A.   ERISA's Relevant Framework ............................................................. 23

          1.   ERISA and Its Age Discrimination Provisions. ................................ 23

          2.   Cash Balance Plans. ................................................................... 24

B.    Plaintiffs' Complaint -- Summary Of Facts .......................................................... 25

     1.    The Plans. ............................................................................................. 25

     2.    The Plans' Conversion to Non-Traditional Benefit Formulas.................... 25

     3.    The Opening Balance Formulas. ............................................................ 27

     4.    The SBC Plan Transition Benefit Formula. .............................................. 28

     5.    The CAM Benefit and Lump Sum Form of Payment Under the SBC Plan and the Ameritech Plan. ...................................................................... 29

C.    Plaintiffs' Counts ....................................................................................... 29

D.    Each Of Plaintiffs' Counts Should Be Dismissed For Failure To State A Claim .......................................................................................................... 31

     1.    Count Four Must Be Dismissed As Neither The SBC Plan's, The Ameritech Plan's, The PTG Plan's, Nor The SNET Plan's Ongoing Cash Balance Or Pension Equity Formula Violates ERISA § 204(b)(1)(H). ......................................................................................... 31

         a.    ERISA Does Not Require That The Rate Of Benefit Accrual Be Measured In Terms Of A Participant's Age-65 Accrued Benefit In A Cash Balance Plan As Plaintiffs Contend ................... 32

         b.    ERISA § 204(b)(1)(H) Applies Only To Employees Who Work After The Age of 65 ............................................................. 37

     2.    Counts Two And Three Must Be Dismissed As Neither The Opening DLS Benefit Formula Under The Ameritech Plan Nor The Opening Account Balance Formula Under The PTG Plan Violates ERISA § 204(b)(1)(H). ......................................................................................... 38

         a.    The Opening Benefit Formulas Do Not Violate § 204(b)(1)(H) On A Nominal Basis ...................................................................... 38

         b.    The Opening Benefit Formulas Do Not Violate § 204(b)(1)(H) On An Age-65 Basis .......................................................................... 40

     3.    Count One Must Be Dismissed As The Transition Benefits Under The SBC Plan Do Not Violate ERISA § 204(b)(1)(H). ............................... 41

         a.    The Transition Benefit Formula Does Not Violate § 204(b)(1)(H) On A Nominal Basis .................................................. 41

         b.    The Transition Benefit Formula Does Not Violate § 204(b)(1)(H) On An Age-65 Basis .................................................. 43

     4.    Count Five Must Be Dismissed As The Lump Sum Distribution Option Under The SBC Plan And The Ameritech Plan Is Not An Unlawful Forfeiture In Violation Of ERISA § 204(b)(1)(G). ..................... 43

CONCLUSION ..................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Air Line Pilots Ass'n v. Eastern Air Lines,*
  672 F.Supp. 525 (D.D.C. 1987) ................................................................ 14

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.,*
  212 F.3d 1031 (7th Cir. 2000) .................................................................. 6

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield,*
  97 F.3d 822 (5th Cir. 1996) .................................................................... 7

*Boyer v. J.A. Majors Co. Employees' Profit Sharing Plan,*
  481 F.Supp. 454 (N.D. Ga. 1979)............................................................. 8

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) ............................................................................ 4

*Campbell v. Bank Boston, N.A.,*
  327 F.3d 1 (1st Cir. 2003)...................................................................... 37

*Central Laborers' Pension Fund v. Heinz,*
  541 U.S. 739 (2004) ............................................................................ 44

*Chung v. Chrysler Corp.,*
  903 F.Supp. 160 (D.D.C. 1995) ............................................................... 14

*Cole v. Cent. States, Se. & Sw. Areas Health & Welfare Fund,*
  227 F.Supp.2d 190 (D. Mass. 2002) ...................................................... 8, 10

*Combs v. Adkins & Adkins Coal Co.,*
  597 F.Supp. 122 (D.D.C. 1984) ............................................................... 6

*Commc'ns Workers of Am. v. AT&T,*
  40 F.3d 426 (D.C. Cir. 1994).................................................................. 31

*Cooper v. IBM Pers. Pension Plan,*
  274 F.Supp.2d 1010 (S.D. Ill. 2003), *appeal docketed*, No. 05-3588 (7th Cir.
  Sept. 9, 2005) ................................................................................... 33

*Diamond Chem. Co. v. Atofina Chems., Inc.,*
  268 F.Supp.2d 1 (D.D.C. 2003) ............................................................... 3

* *Eaton v. Onan Corp.,*
  117 F.Supp.2d 812 (S.D. Ind. 2000) ...................................... 34, 35, 38, 40, 42

*El-Fadl v. Cent. Bank of Jordan,*
  75 F.3d 668 (D.C. Cir. 1996)............................................................... 4, 10

*Flynn v. Fischer Tile & Marble, Inc.*,
    No. 01-0098 (ESH), slip op. (D.D.C. Feb. 5, 2002)...................................................... 18

*Flynn v. Ohio Bldg. Restoration, Inc.*,
    260 F.Supp.2d 156 (D.D.C. 2003) ............................................................................... 6

*Flynn v. Ravare Masonry*,
    No. 01-1236 (PLF), slip op. at 1-2 (D.D.C. Jan. 3, 2002) ........................................... 18

*Flynn v. Veazey Constr. Corp.*,
    310 F.Supp.2d 186 (D.D.C. 2004) ...........................................................15, 16, 18, 22

*Gemological Inst. of Am., Inc. v. Thi-Dai Phan*,
    145 F.Supp.2d 68 (D.D.C. 2001) ................................................................................ 15

*Gorman v. Ameritrade Holding Corp.*,
    293 F.3d 506 (D.C. Cir. 2002) ..................................................................................... 3

*Hawksbill Sea Turtle v. FEMA*,
    939 F.Supp. 1 (D.D.C. 1996) ...................................................................................... 14

*Hoover v. Cumberland, Md. Area Teamsters Pension Fund*,
    756 F.2d 977 (3d Cir. 1985) ........................................................................................ 40

*I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.*,
    699 F.2d 1254 (D.C. Cir. 1983) ................................................................................ 4, 9

*In re Vitamins Antitrust Litig.*,
    270 F.Supp.2d 15 (D.D.C. 2003) .................................................................................. 4

*Int'l Painters & Allied Trade Indus. Pension Fund v. Tri-State Interiors, Inc.*,
    357 F.Supp.2d 54 (D.D.C. 2004) ...................................................................15, 16, 22

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945) .................................................................................................. 3, 6

*Islamic Republic of Iran v. Boeing Co.*,
    477 F.Supp. 142 (D.D.C. 1979) .................................................................................. 15

*Jung v. Ass'n of Am. Med. Colls.*,
    300 F.Supp.2d 119 (D.D.C. 2004) ............................................................................... 9

*Kafack v. Primerica Life Ins. Co.*,
    934 F.Supp. 3 (D.D.C. 1996) ................................................................................ 13, 15

*Keating v. Whitmore Mfg. Co.*,
    981 F.Supp. 890 (E.D. Pa. 1997) ................................................................................. 8

*LaRouche v. Fowler,*
  77 F.Supp.2d 806 (D.D.C. 1999) ................................................................ 2

*Laurent v. PricewaterhouseCoopers LLP,*
  No. 04-809-GPM, 2005 WL 1221304, at *2 (S.D. Ill. May 20, 2005) ........................ 11

*McClamrock v. Eli Lilly and Co.,*
  267 F.Supp.2d 33 (D.D.C. 2003) .............................................................. 15

*Mwani v. Bin Laden,*
  417 F.3d 1 (D.C. Cir. 2005) ................................................................ 4, 5

* *National Air Traffic Controllers Ass'n v. Dental Plans, Inc.,*
  407 F.Supp.2d 1 (D.D.C. 2005) ......................................................... 7, 16, 17

*Peay v. BellSouth Medical Assistance Plan,*
  205 F.3d 1206 (10th Cir. 2000) .............................................................. 6

*Pothier v. Bank of America Corp.,*
  No. 04-0458-GPM (S.D.Ill. May 16, 2005) .................................................... 17

* *Register v. PNC Financial Services Group, Inc.,*
  No. 04-CV-6097, 2005 U. S. Dist. LEXIS 29678 (E.D. Pa. Nov. 21, 2005) ..... 33, 34, 40

*Reiffin v. Microsoft Corp.,*
  104 F.Supp.2d 48 (D.D.C. 2000) ......................................................... 13, 15

*Reklau v. Merchs. Nat'l Corp.,*
  808 F.2d 628 (7th Cir. 1986) ............................................................... 30

*Schmidt v. American Institute of Physics,*
  322 F.Supp.2d 28 (D.D.C. 2004) ............................................................. 14

*Seitz v. N.Y. State Teamsters Conference Pension & Ret. Fund,*
  953 F.Supp. 100 (S.D.N.Y. 1997) ......................................................... 4, 10

*Starnes v. McGuire,*
  512 F.2d 918 (D.C. Cir. 1974) .............................................................. 14

*Stewart Org., Inc. v. Ricoh Corp.,*
  487 U.S. 22 (1988) ......................................................................... 13

* *Tootle v. ARINC, Inc.,*
  222 F.R.D. 88 (D. Md. 2004) ............................................................ 34, 38

*Trout Unlimited v. USDA,*
  944 F.Supp. 13 (D.D.C. 1996) ........................................................... 14, 20

*Turner v. CF & I Steel Corp.*,
  510 F.Supp. 537 (E.D. Pa. 1981) ............................................................... 8

*United States v. Trucking Employers, Inc.*,
  72 F.R.D. 98 (D.D.C. 1976)........................................................................ 9

*Van Dusen v. Barrack*,
  376 U.S. 612 (1964) ............................................................................ 12, 13

*Varsic v. United States District Court*,
  607 F.2d 245 (9th Cir. 1979) ................................................................ 9, 10

*Vencor Nursing Ctrs., L.P. v. Shalala*,
  63 F.Supp.2d 1 (D.D.C. 1999)................................................................... 15

*Waeltz v. Delta Pilots Retirement Plan*,
  137 F.Supp.2d 1091 (S.D. Ill. 2001), *aff'd,* 301 F.3d 804 (7th Cir. 2002) .......... 5, 10, 11

*Wells v. Gannett Ret. Plan*,
  385 F.Supp.2d 1101 (D. Col. 2005) ......................................................... 38

*Willingway Hosp., Inc. v. Blue Cross & Blue Shield*,
  870 F.Supp. 1102 (D. Ga. 1995) ................................................................ 7

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ................................................................................... 5

## Statutes and Legislative Materials

28 U.S.C. § 1404(a) ...................................................... 12, 13, 14, 17, 44

29 U.S.C. §§ 1001-1461............................................................................ 23

29 U.S.C. § 623(i) .................................................................................... 24

29 U.S.C. § 1001(a) ................................................................................. 23

29 U.S.C. § 1002(23), (24), (34), (35) ..................................................... 24

29 U.S.C. § 1054(b)(1)(B) ....................................................................... 40

29 U.S.C. § 1054(b)(1)(G) ................................................... 2, 24, 30, 43, 44

29 U.S.C. § 1054(b)(1)(H) ..................... 2, 23, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43

29 U.S.C. § 1054(b)(1)(H)(i).................................................................... 24

29 U.S.C. § 1054(b)(1)(H)(ii)............................................................. 40, 42

29 U.S.C. § 1054(b)(1)(H)(vi) ................................................................ 30, 36

29 U.S.C. § 1132(a)(1)(B) .............................................................................. 31

29 U.S.C. § 1132(e) ........................................................................................ 12

29 U.S.C. § 1132(e)(2) ............................................................ 5, 7, 9, 10, 11, 13

29 U.S.C. § 1202(c) ........................................................................................ 30

* H.R. Rep. No. 99-1012 (1986), reprinted in 1986 U.S.C.A.N.N. 3868 ................ 23, 24, 35, 37

I.R.C. § 411(b)(1)(G) ..................................................................................... 30

I.R.C. § 411(b)(1)(H) ...................................................................... 24, 30, 36, 37

I.R.C. § 411(b)(1)(H)(v) ................................................................................. 30

## Regulations

56 Fed. Reg. 47,524 (Sept. 19, 1991) .......................................................... 36

67 Fed. Reg. 76,123 (Dec. 11, 2002) ........................................................... 36

Treas. Reg. § 1.401(a)(4)-4(e)(1) ................................................................. 44

Treas. Reg. § 1.401(a)(4)-8(c)(3) ................................................................. 24

Treas. Reg. § 1.401(a)(4)-8(c)(3)(vi) ........................................................... 25

Treas. Reg. § 1.411(a)-11(a)(2) .................................................................... 44

Treas. Reg. § 1.411(d)(4), Q&A-1 ................................................................ 44

* Treas. Reg. § 1.411(d)-4, Q&A-6(a)(1), (b)(1) .......................................... 44

## Other Authorities

4 Wright & Miller, Federal Practice and Procedure (3d ed. 2002) ................ 3

7A Wright & Miller, Federal Practice and Procedure (3d ed. 2005) ............. 8

15 Wright & Miller, Federal Practice and Procedure (2d ed. 1986) ............ 14

Federal Judicial Caseload Statistics (Mar. 31, 2005) ................................ 21

U.S. Dep't of Treasury, General Explanations of the Administration's Fiscal Year 2006
    Revenue Proposals (2005) ........................................................................ 36

\*        Cases or authorities on which Defendants chiefly rely

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| )<br>REED J. NEWLIN, OCTAVIA )<br>KINCHLOE, DOREEN J. LEW, )<br>and BRADFORD J. PARSONS, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>SBC PENSION BENEFIT PLAN and )<br>AT&T INC., )<br>)<br>Defendants. )<br>) | **ORAL HEARING REQUESTED**<br><br><br>Civil Action No. 05-01939-CKK<br><br>(Judge Kollar-Kotelly) |

### MEMORANDUM IN SUPPORT OF DEFENDANTS'
### MOTION (1) TO DISMISS FOR LACK OF PERSONAL JURISDICTION
### OR VENUE, (2) TO TRANSFER VENUE, AND (3) TO DISMISS
### FOR FAILURE TO STATE A CLAIM

Four non-residents (two from Illinois, and one from California and Connecticut, respectively) with no apparent connection to the District of Columbia bring this purported class action against a pension plan which is administered in San Antonio, Texas and the plan's sponsor which, too, is headquartered in San Antonio. The Court lacks personal jurisdiction over Defendants, and venue in this district is improper. In addition, Plaintiffs' allegations fail to state a claim because, as a matter of law, the plan provisions about which Plaintiffs complain do not violate the age discrimination provisions of ERISA. Thus, the case should be dismissed. In the alternative, because the dispute has no connection to the District of Columbia, the Court should transfer the case to the Western District of Texas, San Antonio Division, where the plan is administered and its sponsor is headquartered.

The Complaint also fails to state a claim. Plaintiffs challenge the "cash balance" features of the SBC Pension Benefit Plan (the "Plan" or "SBC Plan") and three plans of affiliates that were merged into it. Before amendment, the plans were traditional defined benefit pension plans that provided a monthly retirement benefit based on the participants' wages and length of service. The Plan was amended to permit participants to enjoy a monthly accumulation of credits based on wages and interest (i.e., a "cash balance" or "defined lump sum") in a hypothetical account and to receive their retirement benefit in a single payment that represented the present value of the future monthly benefits to the participant during retirement. Purporting to represent a class of all persons who participated in the plans after amendment, Plaintiffs attack the design of cash balance amendments, contending that those provisions discriminate among the Plan's participants on the basis of age in violation of sections 204(b)(1)(G) and (H) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1054(b)(1)(G) and (H). Plaintiffs seek an order requiring the Plan to be rewritten and also seek unspecified additional cash benefits from the Plan.[1]

## ARGUMENT

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS

Plaintiffs' complaint should be dismissed for lack of personal jurisdiction. "To assert personal jurisdiction over a nonresident defendant, a federal court must satisfy the Due Process Clause of the Fifth Amendment." *LaRouche v. Fowler*, 77 F.Supp.2d 80, 86 (D.D.C. 1999). Both Defendants lack the minimum contacts necessary to satisfy traditional notions of fair play

---

[1] After this action was filed, on November 18, 2005, SBC Communications Inc. ("SBC") completed its acquisition of AT&T Corp., with the surviving enterprise named AT&T Inc. ("AT&T"). For convenience, context, and for consistency with the terminology used in the Complaint, we will refer to Defendants as "the Plan," "the SBC Plan," and "AT&T" or "SBC."

and substantial justice and personal jurisdiction, therefore, is not proper. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

### A.    Defendants Do Not Have Sufficient Contacts For "General Jurisdiction"

Courts analyze personal jurisdiction in terms of general and specific jurisdiction. The due process clause "permits . . . general jurisdiction over foreign corporations 'only . . . if the defendant's business contacts with the forum district are "continuous and systematic.'" *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F.Supp.2d 1, 6 (D.D.C. 2003) (quoting *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506, 509-10 (D.C. Cir. 2002)). In order to assert general jurisdiction over an out-of-state defendant, there must be substantial forum related activity on the part of the defendant. *See* 4 Wright & Miller, Federal Practice and Procedure § 1067.5 (3d ed. 2002).

Defendant AT&T Inc. is a holding company that has no contacts with the District. It is a Delaware corporation, headquartered in San Antonio. Starlene Meyerkord Affidavit ¶ 2. It has no employees in the District of Columbia; does no business here, nor is it authorized to do business here. *Id.* ¶¶ 4, 5. It owns no property here. *Id.* ¶ 6. It has no agent for service of process in the District of Columbia. *Id.* ¶ 7. It has never paid franchise, income, property, severance, or use taxes here. *Id.* ¶ 8.

Likewise, the Plan does not have sufficient continuous and systematic activities within the District. While it is true that some participants in the Plan are District residents, the vast majority are not. For example, only 17 active participants (about 1/100 of 1%) live in the District of Columbia. Liaw Huang Affidavit ¶ 4. Furthermore, the Plan is administered in San Antonio, Texas, and significant activities associated with the Plan are performed there. Hannah Patterson Affidavit ¶ 3. The Plan Design Department is based in San Antonio, and the employees directly responsible for oversight and management of the Plan's operations and vendors are also located

in San Antonio. *Id.* Appeals of all benefit claims are heard in San Antonio, and all of the fiduciaries of the Plan are located there. *Id.*

In short, neither Defendant has the continuous and systematic contacts necessary for general jurisdiction. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 675-76 (D.C. Cir. 1996) (allegations of general jurisdiction based on loans, related litigation, and contacts with subsidiary were isolated and sporadic contacts not sufficient for general jurisdiction); *In re Vitamins Antitrust Litig.*, 270 F.Supp.2d 15, 36 (D.D.C. 2003) (general jurisdiction in District of Columbia not proper where only contacts were attendance at regulatory hearings).

**B.     There Is No "Specific Jurisdiction" In This Case**

Where a defendant's activities are not so pervasive as to subject him to general jurisdiction, the court may nonetheless exercise specific jurisdiction if the "nature and quality" of the defendant's limited contacts with the forum are substantially related to the cause of action. *I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.*, 699 F.2d 1254, 1258 (D.C. Cir. 1983) (addressing specific jurisdiction standard for ERISA service of process provision).

> "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, th[e] 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Mwani v. bin Laden*, 417 F.3d 1, 12 (D.C. Cir. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

No part of the causes of action asserted by these Plaintiffs occurred in the District of Columbia. Absent such allegations, there is no "specific jurisdiction." The mere fact that a small number of other plan participants, none of whom is a plaintiff, reside in the District is not sufficient to establish personal jurisdiction on the basis of specific jurisdiction. *See Seitz v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 953 F.Supp. 100, 102 (S.D.N.Y. 1997)

(presence in district of contributing employers and retirees receiving benefits other than plaintiffs not sufficient to satisfy the "minimum contacts" test). In *Waeltz v. Delta Pilots Retirement Plan,* the court held that the residence of two plan participants (out of a total of 2740 plan participants) in a district was not sufficient to establish minimum contacts over the plan. 137 F.Supp.2d 1091, 1094-95 (S.D. Ill. 2001), *aff'd*, 301 F.3d 804 (7th Cir. 2002). Here, there are even fewer than the .07 % of participants the court found to be insufficient in *Waeltz*. Plaintiffs themselves do not have any connection with this forum. It can hardly be said that the nature and quality of Defendants' contacts with Plaintiffs in relation to this cause of action warrant the exercise of specific jurisdiction.

## C.    ERISA's Nationwide Service Of Process Does Not Confer Personal Jurisdiction

Even though neither Defendant has minimum contacts with this jurisdiction, Plaintiff asserts that ERISA's nationwide service of process provision confers personal jurisdiction over Defendants in this district. Compl. ¶ 7. However "before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant. There also must be authorization for service of summons on the defendant, and a constitutionally sufficient relationship between the defendant and the forum." *Mwani*, 417 F.3d at 8. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The ERISA statute states that "[w]here an action under this subchapter is brought in a district court of the United States . . . process may be served in any other district where a defendant resides or may be found." ERISA § 502(e)(2); 29 U.S.C. § 1132(e)(2). Some courts have construed this "nationwide service of process" provision to confer personal jurisdiction over a defendant without regard to minimum contacts with the forum so long as the defendant has sufficient minimum contacts with the United States as a whole. *See, e.g., Flynn v. Ohio*

*Bldg. Restoration, Inc.*, 260 F.Supp.2d 156, 170-73 (D.D.C. 2003); *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035-37 (7th Cir. 2000). No decision of the D.C. Circuit so holds, and Defendants submit that this "national contacts test" disregards the *International Shoe's* Constitutional minimum contacts test.

      *Flynn* determined that the national contacts test did not violate the defendant's due process liberty interest, in part, because: "Although it may be inconvenient to the defendant to have to defend this action in this district, it is convenient to the plan, reducing its costs, to the benefit of all plan beneficiaries. Congress has balanced the plan's interest and permitted suit where the plan is located." 260 F.Supp.2d at 171-72. In deciding to apply the national contacts test, *Flynn* partly relied on another ERISA case, *Combs v. Adkins & Adkins Coal Co.*, 597 F.Supp. 122 (D.D.C. 1984) (quotations omitted), where the court applied the national contacts test based on a similar national service provision, finding that "[t]he defendants were given ample notice that litigation could ensue in the District of Columbia, and in any event, it makes good sense to hear this case where the Plans are administered." 597 F.Supp. at 125. Neither *Flynn* nor *Combs* controls or is instructive here. Both involved plaintiff pension plans suing out-of-state defendants in the plans' home forum. Relying on the Congressional purpose of permitting suit where the plan is located, the courts allowed the plaintiff plans to sue in their home forum, but did not consider the due process implications of that result.

      Other courts, considering such an argument, have rejected or expressed doubts about it. *See Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206, 1211 (10th Cir. 2000) ("Under . . . the so-called 'national contacts' test, a plaintiff could sue a defendant in any federal court in the United States, regardless of the defendant's contacts with the forum or the burden on the defendant of litigating in that forum. We are convinced that due process requires something

more"); *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 825-26 (5th Cir. 1996) (applying national contacts test but expressing "grave misgivings":  "We fail to apprehend how personal jurisdiction can be separated from due process by Congressional enactment of nationwide service of process provisions"); *Willingway Hosp., Inc. v. Blue Cross & Blue Shield*, 870 F.Supp. 1102, 1106 (D. Ga. 1994) (criticizing national contacts test that confers personal jurisdiction whenever defendant simply has minimum contacts with the United States, and using alternative approach).

## II.    VENUE IS IMPROPER IN THE DISTRICT OF COLUMBIA

Even if Plaintiffs' allegations are held sufficient to allege personal jurisdiction over Defendants because of the nationwide service of process statute, venue is not proper in this district.[2/]  ERISA has a special venue provision.  A plaintiff may bring an action in (1) the district where the plan is administered, (2) the district where the breach took place, or (3) the district where a defendant resides or may be found.  29 U.S.C. § 1132(e)(2).  Plaintiffs' do not allege that the Plan is administered in the District, but do allege that venue is proper under the other prongs.[3/]  Because the supposed breach did not occur in this district, and because Defendants neither reside nor may be found in this district, venue is improper.

### A.    The Breach Did Not Occur In The District Of Columbia

The court of appeals has not ruled on the issue of where a breach "takes place" for purposes of establishing venue under ERISA § 502(e).  District courts outside of this circuit are split on this question.  Some courts have held that the breach occurs where decisions regarding

---

[2/] "Although the D.C. Circuit has not identified the party who bears the burden in a challenge to venue, most courts place the burden on the plaintiff."  *National Air Traffic Controllers Ass'n v. Dental Plans, Inc.*, 407 F.Supp.2d 1, 2 (D.D.C. 2005).

[3/] The initial complaint conceded that the Plan is not administered in the District of Columbia (¶ 13 n.1), and the current complaint does not allege that the Plan is administrated in the District.  Compl. ¶¶ 8-13.

payment were made. *E.g., Turner v. CF & I Steel Corp.*, 510 F.Supp. 537, 541 (E.D. Pa. 1981) (breach occurs where "decisions regarding payment were made" or from where the checks were sent); *Boyer v. J.A. Majors Co. Employees' Profit Sharing Plan,* 481 F.Supp. 454, 459 (N.D. Ga. 1979) (breach occurred where trustee issued a stop payment on a check). Other courts have ruled that the breach takes place "at the place where performance was due," i.e., where the plaintiff was to receive the benefits. *E.g., Cole v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 227 F.Supp.2d 190, 195-96 (D. Mass. 2002); *see also Keating v. Whitmore Mfg. Co.*, 981 F.Supp. 890, 892-93 (E.D. Pa. 1997). Regardless of which test this court adopts, venue is improper in this district on the claims of these non-resident plaintiffs.

That said, the first line of cases makes greater sense in determining where venue lies in this action, because the supposed breach occurred when the Plan decided the level of pension and transition benefits, not where beneficiaries opened their mail and received the results of those decisions. The Plan made no decisions with regards to the payment and administering of the Plan in the District. The Plan is administered in San Antonio, and no decisions were made by the Plan in this district. Similarly, AT&T Inc. is a Delaware corporation, with its principal place of business in San Antonio, Texas. Meyerkord Aff. ¶ 2. Therefore, the breach did not occur here.

It is also apparent that, under the "at the place performance was due" standard, the breach did not occur here. None of the named Plaintiffs resides in the District of Columbia. Nor is it alleged that any of these Plaintiffs received benefits in this district.

Plaintiffs attempt to evade this requirement by claiming that some of the putative class members would be found in the District. Venue is tested based upon individual claims of the named plaintiffs. *See* 7A Wright & Miller, Federal Practice and Procedure § 1757 (3d ed. 2005) (general rule is that only the residences of the named parties are relevant for determining whether

venue is proper); *see also Jung v. Ass'n of Am. Med. Colls.,* 300 F.Supp.2d 119, 136 n.8 (D.D.C. 2004) (in antitrust suit, plaintiffs cannot rely on putative class members to meet requirements of long arm statute); *United States v. Trucking Employers, Inc.*, 72 F.R.D. 98, 100 (D.D.C. 1976) (in Title VII case, whether venue is proper determined by named parties, not absent class members). The fact that Plaintiffs have asked the Court at some point to certify a class that may contain District of Columbia residents is of no significance to the venue determination.

### B.    Defendants Are Not Found In The District Of Columbia

Plaintiffs also cannot establish venue under the third ERISA prong, that the "defendant resides or may be found" in the district. 29 U.S.C. § 1132(e)(2), ERISA § 502(e)(2). In *Varsic v. United States District Court,* 607 F.2d 245 (9th Cir. 1979), the Ninth Circuit held that, for purposes of establishing venue under ERISA § 502(e)(2), a defendant retirement plan may be "found" in any district where the plan's contacts with the district are "sufficient to satisfy the 'minimum contacts' test for personal jurisdiction." *Id.* at 248-49. Although the D.C. Circuit has not analyzed *Varsic* with respect to ERISA venue, the court has adopted the *Varsic* test for determining where a defendant may be "found" for purposes of establishing service of process in the ERISA context. *See I.A.M.,* 699 F.2d at 1257. The *I.A.M.* court noted in its analysis of *Varsic* that "[t]he Ninth Circuit's resort . . . to the current due process test for *in personam* jurisdiction of a corporation to determine the meaning of 'found' as a venue requirement is, we think, sound." *I.A.M.,* 699 F.2d at 1257.

The *Varsic/I.A.M.* "minimum contacts" test for ERISA venue/personal jurisdiction is met if either (1) the defendant's activities within the forum are "substantial" or "continuous and systematic," or (2) the nature and quality of the defendant's contacts in relation to the cause of action warrant the imposition of personal jurisdiction. *See I.A.M.,* 699 F.2d at 1258.

As demonstrated in Part I, Defendants' activities within the forum have certainly not been "substantial" or "continuous and systematic." The fact that a tiny number (17 active and 50

inactive) of the Plan's hundreds of thousands of participants, none of whom is a named plaintiff, reside in the District is insufficient in nature and quality to find minimum contacts. *See Seitz*, 953 F.Supp. at 102 (holding that presence in the district of contributing employees other than the plaintiffs was not sufficient to satisfy the *Varsic* "minimum contacts" test); *Waeltz,* 137 F.Supp.2d at 1095 (residence of two out of 2740 plan participants in a district was not sufficient to establish venue over the plan); *Cole*, 227 F.Supp.2d at 198 (questioning whether the residence of 15 plan participants would be sufficient to establish venue in the district).[4/]

Nor do the nature and quality of Defendant's contacts in relation to this cause of action warrant the finding of minimum contacts since there are no such contacts. Venue is improper in the absence of a named plaintiff who was allegedly injured in the District because the "nature and quality" of Defendants' contacts with the forum are not substantially related to Plaintiffs' cause of action. The alleged violations of ERISA by the San Antonio-based Plan and AT&T with respect to a plaintiff from Connecticut, a plaintiff from California, and two plaintiffs from Illinois have no connection to the District of Columbia.

Given the lack of sufficient contacts with this district, neither AT&T nor the Plan can be "found" in this district under the definition under ERISA § 502(e)(2).

### C.     Defendants' Residence In The Western District Of Texas Does Not Establish Venue In The District Of Columbia

Additionally, Plaintiffs allege that Defendants are subject to venue, because they are subject to nationwide service of process under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Compl. ¶ 10. Plaintiffs seek to conflate the ERISA provision providing for <u>service of process</u> "**in any other district** where a defendant resides or may be found" with the ERISA provision

---

[4/] The fact that some of AT&T's operating subsidiaries have contacts with federal regulatory authorities in the District is of no significance. Jurisdiction over a parent company may not be established based only upon the activities of a subsidiary. *El-Fadl*, 75 F.3d at 676.

providing for venue "in the district . . . where a defendant resides or may be found."  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) (emphasis added).  This would have the effect of making the entire venue provision superfluous, because if venue were proper anywhere that a defendant could be served (which under ERISA is nationwide), there would be no need to state that venue is proper in a district where the breach occurred or where the plan is administered.  Under Plaintiffs' theory, a corporate defendant that resides in any district in the country also would reside in every other district in the country for venue purposes.  Thus, a beneficiary could maintain a suit against a pension plan in any district in the country, even if no part of the claim, or any party involved, had anything to do with that particular district.  Plaintiffs' argument recently has been rejected in another cash balance pension case.  *Laurent v. PricewaterhouseCoopers LLP*, No. 04-809-GPM, 2005 WL 1221304, at *2 (S.D. Ill. May 20, 2005) (Tab A).  The court in that case ruled that Congress had not equated ERISA's service of process with its venue provisions in order to create a nationwide venue provision.  Likewise, the Seventh Circuit rejected a similar argument in *Waeltz*, where the petitioner had argued for a nationwide definition of "may be found" for venue purposes.  301 F.3d at 808.  The court ruled such a construction would "render superfluous the other clauses of ERISA's venue provision."  *Id.*[5]

---

[5] Plaintiffs suggest that Defendants cannot contest personal jurisdiction or venue in this case because the Plan did not contest personal jurisdiction or venue in the *Wagener v. SBC Pension Benefit Non-Bargained Program*, No. 03-769-RCL (D.D.C.) case, also pending in this district.  Compl. ¶ 13.  Whether jurisdiction or venue exists there does not determine whether they exist here.  The Plan filed no pleadings in *Wagener* announcing an intention to waive jurisdictional or venue defenses generally for the Plan, much less for a future case with different facts.  The claims in *Wagener* are different legally and factually from those in this case.  Further, one of the plaintiffs in *Wagener* is a resident of the District of Columbia, while here all four plaintiffs are nonresidents of the District.

III.   **IF NOT DISMISSED, THE CASE SHOULD BE TRANSFERRED TO WHERE THE PLAN IS ADMINISTERED**

Even if venue is proper in this district, the Court should transfer the case to the Western District of Texas, San Antonio Division.  The case has virtually no connection - and certainly no significant one - to the District of Columbia.  None of the named Plaintiffs lives here.  Only seventeen, i.e., approximately 1/100 of 1%, of the active participants in the Plan are District residents.  In contrast, the Plan is headquartered and administered in San Antonio, which is in the Western District of Texas.  Those directly responsible for the oversight and management of the Plan are in Texas, as are the principal records of the Plan and its co-defendant, AT&T.  Further, more than 32,000 active participants in the Plan reside in Texas, with more than 5,000 in the San Antonio area.  In weighing the convenience of the parties and the witnesses and the interests of justice, the balance clearly tips in favor of transfer to the Western District of Texas.

A.     **Standards For Section 1404(a) Transfer**

A court may transfer a case for the convenience of the parties or witnesses and when the interests of justice are served:

> "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).

Under section 1404(a), a district court has the discretion to decide transfer motions based on "individualized, case-by-case consideration of convenience and fairness."  *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964).

As a threshold issue, a court must consider whether the case could have been originally filed in the proposed transferee forum.  Here, it is clear that the case could have been brought in the Western District of Texas.  The Plan is administered in that district (Patterson Aff. ¶ 3), and the special venue provision of ERISA, 29 U.S.C. § 1132(e), discussed in Part II, expressly

- 12 -

provides that an action may be "brought in the district where the plan is administered." *Id.* § 1132(e)(2). Instead of suing in that appropriate and convenient forum, Plaintiffs instead chose to sue in the District of Columbia, a place that has no connection with the dispute. The Plan is not administered here; it was not designed here. None of the material events took place here. None of the potential witnesses lives here. No evidence is here. Indeed, none of the four named Plaintiffs lives here. This case calls out for transfer.

Once the "might have been brought" threshold is crossed, a court — recognizing that the burden of establishing transfer is on the movant, *Kafack v. Primerica Life Ins. Co.*, 934 F.Supp. 3, 5 (D.D.C. 1996) — decides section 1404(a) transfer motions based upon consideration of convenience and fairness. *Van Dusen,* 376 U.S. at 622, *Reiffin v. Microsoft Corp.* 104 F.Supp.2d 48, 50 (D.D.C. 2000). *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Although the language of the statute refers to the convenience of the parties, the convenience of the witnesses, and the interests of justice, in evaluating motions to transfer under section 1404(a), courts have considered many variants of the private interests of the parties and the public interests of the courts. *Kafack*, 934 F.Supp. at 6. Within these two broad groupings, courts in this circuit have identified a number of case-specific factors to apply when considering a transfer motion. Those include:

1. Plaintiff's choice of forum.

2. Defendant's choice of forum.

3. Whether the claim arose elsewhere.

4. Convenience of the parties.

5. Convenience of the witnesses.

6. Location of books and records; and ease of access to sources of proof and accessibility of witnesses.

- 13 -

7.    Relative congestion of the dockets of the transferor and transferee courts.

8.    Familiarity of the courts with the applicable law.

9.    Local interest in deciding the controversy.

10.    Other practical aspects of expeditiously and conveniently conducting a trial.

*Schmidt v. Am. Inst. of Physics*, 322 F.Supp.2d 28, 31-33 (D.D.C. 2004); *Trout Unlimited v. USDA*, 944 F.Supp. 13, 16 (D.D.C. 1996); *Hawksbill Sea Turtle v. FEMA*, 939 F.Supp. 1, 3 (D.D.C. 1996).  *See Starnes v. McGuire*, 512 F.2d 918, 929-33 (D.C. Cir. 1974).  *See also* 15 Wright & Miller, Federal Practice and Procedure §§ 3847-3854 (2d ed. 1986).

**B.    Application Of The 1404(a) Factors**

Consideration of these familiar factors makes clear that the case should be transferred to the Western District of Texas.  Virtually all of the factors point in that direction.  Certainly none of the factors militates against transfer.  For instance, although Plaintiffs' choice of forum is entitled to some deference, that deference is diminished where the forum that Plaintiffs have chosen has no meaningful ties to the controversy and no particular interest in the parties or the subject matter of the dispute.  Indeed, the only apparent connection between this case and the District of Columbia is the location of one of the offices of Plaintiffs' counsel.  All the key factors point to Texas.  We consider the factors in turn.

1.    Plaintiffs' choice of forum.

It is axiomatic that Plaintiffs' choice of forum is entitled to some deference.  *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F.Supp. 525, 526 (D.D.C. 1987).  Such deference is diminished, however, where the plaintiff's chosen forum has no meaningful ties to the controversy and no particular interest in the parties or the subject matter.  *Chung v. Chrysler Corp.*, 903 F.Supp. 160, 165 (D.D.C. 1995); *Schmidt*, 332 F.Supp.2d at 33-34.  Such is the case here.  The four named Plaintiffs are strangers to the District of Columbia.  They live elsewhere.

Similarly, the events giving rise to the litigation occurred elsewhere, not in the District of
Columbia. The Plan is administered in San Antonio, and the Plan's sponsor is headquartered
there. Design work associated with the Plan takes place in San Antonio, and other functions
important for the operation of the Plan also occur there. Patterson Aff. ¶ 3. Thus, any deference
to Plaintiffs' choice of forum is easily overcome and transfer is appropriate. *See Kafack*, 934
F.Supp. at 6-7 (no meaningful ties to the District of Columbia where material events giving rise
to plaintiff's claims occurred in Maryland); *Islamic Republic of Iran v. Boeing Co.*, 477 F.Supp.
142, 144 (D.D.C. 1979) (District of Columbia has no meaningful ties to controversy because all
operative facts giving rise to the litigation occurred elsewhere). *See also Gemological Inst. of
Am., Inc. v. Thi-Dai Phan*, 145 F.Supp.2d 68, 71 (D.D.C. 2001) (plaintiff's choice of forum
entitled to less deference when plaintiff's preferred forum is not his home forum). The only
apparent connection between this case and the District of Columbia is the location of one of the
offices maintained by Plaintiffs' counsel, but the location of Plaintiffs' counsel and any
inconvenience to him caused by transfer carry little or no weight under section 1404(a).
*McClamrock v. Eli Lilly and Co.*, 267 F.Supp.2d 33, 40-41 (D.D.C. 2003); *Reiffin*, 104
F.Supp.2d at 52 n.7; *Vencor Nursing Ctrs., L.P. v. Shalala*, 63 F.Supp.2d 1, 6 n.4 (D.D.C. 1999).

There are decisions of this Court that refer to "special deference" accorded some ERISA
plaintiffs. *See Int'l Painters & Allied Trade Indus. Pension Fund v. Tri-State Interiors, Inc.*, 357
F.Supp.2d 54, 57 (D.D.C. 2004); *Flynn v. Veazey Constr. Corp.*, 310 F.Supp.2d 186, 193
(D.D.C. 2004). But those decisions and other unreported decisions in this district (*id.* at 193) do
not assist Plaintiffs here. This deference to the ERISA plaintiffs' choice of forum has been given
when the Plan itself is the plaintiff and is suing in its home district. *E.g., Tri-State*, 357

- 15 -

F.Supp.2d at 56.[6/]  Plaintiffs are not ERISA plans, funds, or fiduciaries, and they are not bringing suit in the place where the Plan is administered and themselves have no connection at all to the District of Columbia.  Under those circumstances, Plaintiffs' choice of forum is entitled to little or no deference – let alone special deference.

That not all plaintiffs' choices of forum are entitled to special deference in ERISA cases is made clear by the recent decision in *National Air Traffic Controllers Ass'n v. Dental Plans, Inc.*, No. 407 F.Supp.2d 1 (D.D.C. 2005).  There, a trade association headquartered in the District of Columbia and four association members (who resided elsewhere) brought an ERISA action in the District of Columbia against a dental benefits plan and others.  The plan was headquartered and administered in Georgia.  Based on certain meetings that took place in the District of Columbia between the plan and the plaintiffs, the court ruled that venue was proper in the District of Columbia because the defendants could be found here.  *Id*. at 2 n.2.  Nevertheless, on its own motion, the court transferred the action to the Northern District of Georgia under section 1404(a).  While recognizing that "some deference" should be afforded plaintiffs' choice of forum, the court concluded that deference would be misplaced under the circumstances because the District of Columbia lacked sufficient ties to the parties, facts, and claims in the controversy.  *Id*. at 2.  The court noted that only one of the five plaintiffs was from the District of Columbia, the plan was administered in Georgia, and the activities in Georgia included

---

[6/] In the typical case, a large number of which have been brought in this district, an ERISA multi-employer pension plan brings a delinquency action alleging that an out-of-state defendant employer failed to make full or timely contributions to the fund in question.  *E.g., Tri-State*, 357 F.Supp.2d at 55.  The defendant employer often moves to transfer the case to the district in which the defendant employer is headquartered.  In most instances, the courts have denied those motions to transfer in light of the Congressionally-described purpose of allowing actions to be brought by pension plans in a district where the plan is administered in order to make collection efforts efficient, economical, and inexpensive for ERISA plans, thus protecting the plans from the burden and expense of litigating everywhere any employer resides.  In doing so, those decisions fulfill the Congressional intent of protecting the financial integrity of such funds.  *E.g., Veazey*, 310 F.Supp.2d at 193.

- 16 -

controlling the plan's assets and processing benefit claims.  Accordingly, the court transferred the case to the Northern District of Georgia.

Here, there are even fewer ties to the District of Columbia.  In *Dental Plans*, the lead plaintiff was headquartered here.  In this case, no plaintiff is here.  Plaintiffs reside in Illinois, California, and Connecticut.  No negotiations, meetings, or key events occurred here.  The Plan is administered in San Antonio, and all of its key functions are performed there.  Patterson Aff. ¶ 3.  In short, because there is no connection to the forum, and because the Plan is administered elsewhere, Plaintiffs' choice of forum is entitled to no special deference.  The controversy in this case has no connection to the District of Columbia, and it should be transferred.[7/]

### 2.    Defendants' choice of forum.

Defendants have proposed a transferee forum, the Western District of Texas, San Antonio Division, that is favored by and consistent with all the factors considered by a court under section 1404(a).  San Antonio is where the Plan is headquartered and administered, Patterson Aff. ¶ 3, and it also is where Defendant AT&T is headquartered.  Meyerkord Aff. ¶ 2.  The Plan's Design Department is in San Antonio.  Patterson Aff. ¶ 3.  The employees who oversee and manage the Plan's operations and the vendors who work for the Plan are located in San Antonio.  *Id.*  Benefit appeals are heard in San Antonio, and all of the Plan's fiduciaries are located there.  *Id.*  As noted above, in enacting ERISA, Congress stated a strong preference for actions brought by pension plans in the district where the plan is administered in order to make

---

[7/] Indeed, in a recent nationwide class action involving an ERISA cash balance plan, the court, finding it "not even a close case," had little difficulty transferring the case from a place where it had virtually no ties (Southern District of Illinois) to the Western District of North Carolina where the plan was administered and the plan's sponsor was headquartered.  *Pothier v. Bank of America Corp.*, No. 04-0458-GPM, Mem. and Order at 4 (S.D. Ill. May 16, 2005) (Tab B).

such litigation efficient, economical, and inexpensive for ERISA plans. Doing so protects the financial integrity of plans. *Veazey*, 310 F.Supp.2d at 193.

Indeed, a review of the case law makes clear that the place of administration of the ERISA plan is the touchstone of transfer cases. For example, in *Flynn v. Fischer Tile & Marble, Inc.*, No. 01-0098 (ESH), slip op. (D.D.C. Feb. 5, 2002) (Tab C), despite the existence of other factors that favored transfer, the court believed that they were substantially outweighed by "the policy behind bringing ERISA suits in the district in which the fund is administered." *Id.* at 7. *See also Flynn v. Ravare Masonry*, No. 01-1236 (PLF), slip op. at 1-2 (D.D.C. Jan. 3, 2002) (Tab D) (although defendant's transfer arguments were not without merit, they could not overcome plaintiff's choosing the forum in which the ERISA plan was administered). In short, the place where the plan is administered is an extremely important factor in considering a motion to transfer. Because Defendants have proposed the place where the Plan is administered as the transferee forum, the Defendants' choice of forum should be heeded and the case transferred there.

3.      Claims arise elsewhere.

The claims did not arise in the District of Columbia. The claims, if they arose anywhere, arose in San Antonio. The Complaint makes clear that the events in question and the controversy did not arise here. Plaintiffs make five claims for relief, alleging age discrimination and challenging the legality of the design and operation of four ERISA-governed "cash balance" and "pension equity" plans – the Plan and three other pension plans that were merged into the Plan. Compl. ¶¶ 96-122. None of those alleged discriminatory actions took place in the District of Columbia. To be sure, the Complaint alleges that "some of the breaches" occurred here "because benefits due as a matter of law were not paid to proposed Class members that should

have been paid in this District." *Id.* ¶ 12.[8]  For purposes of this transfer motion, such a conclusory statement is not controlling.  Plus, the allegation proves too much:  If breaches occurred where any putative class member should have been paid, then alleged breaches would have occurred in virtually every state in the country, and the claims would have arisen in all those states.  Instead, the claims, if any, arose where the Plan is administered.

4.    Convenience of parties.

No party will be inconvenienced by a transfer to the Western District of Texas.  The named Plaintiffs live in Illinois, California, and Connecticut, and, in the absence of transfer, would be required to travel to the District of Columbia if their attendance was required.  Travel to Texas would involve no greater burden.  Moreover, both Defendants are headquartered in the Western District of Texas, and the Plan is administered there.  This factor clearly supports transfer.

5.    Convenience of witnesses.

As shown elsewhere, Plaintiffs' claims fail as a matter of law and should be dismissed.  Thus, the convenience of the witnesses does not come into immediate play.  If discovery and/or trial should become necessary, then the convenience of the witnesses factor clearly points to the Western District of Texas.  Although at this early date Plaintiffs have not submitted a witness list, Defendants are aware of no witnesses who reside in the District of Columbia.  Certainly the named Plaintiffs do not.  Defendants, on the other hand, have shown that the Plan-related activities occur in the San Antonio area,  Patterson Aff. ¶ 3, and the persons who perform them reside or work there.  *Id.*  This is hardly surprising, as both Defendants are headquartered there,

---

[8] The reference is to non-party participants.  Only 1/100 of 1% of the active (a total of 17) and 3/100 of 1% of the inactive participants (a total of 50) are in the District.  Huang Aff. ¶¶ 4, 5.  In contrast, 20.6% of active participants and 15.9% of inactive participants are in Texas.  *Id.*

and the Plan is administered there. The persons, including current and former employees, who have made key decisions concerning the planning and operations of the Plan reside in or around San Antonio. *Id.* It obviously would be far more convenient for them to attend judicial proceedings in the Western District of Texas than to travel more than 1,200 miles to the District of Columbia. This factor clearly supports transfer of the case.

      6.      <u>Location of books and records and access to sources of proof</u>.

      We are aware of no books, records, or documentary evidence in the District of Columbia. If the named Plaintiffs have any records, presumably, they are in Illinois, California, and Connecticut, not in the District of Columbia. Most of the Defendants' records and the key documents in this case are located in San Antonio, not in the District of Columbia. No known witnesses are located in the District of Columbia, but those who oversee and manage the Plan's operations are located in San Antonio. Patterson Aff. ¶ 3. Many of those witnesses, including former employees of the Defendants, could be reached through a compulsory process in the Western District of Texas, but could not be compelled to attend trial in the District of Columbia.

      7.      <u>Docket congestion</u>.

      Transfer would not delay resolution of this case. The case is at its early stages. No answer has been filed; no discovery has occurred; and this is the first contested motion. Thus, the Court has not yet familiarized itself with the underlying merits. Consequently there would be no delay associated with a transfer to the Western District of Texas. *See Trout Unlimited*, 944 F.Supp. at 19 (transfer would not lead to delay because case was at its earliest stages). Moreover, judicial statistics for both districts show that a transfer would not cause delay. By any standard that one chooses, the backlog and the time it takes to resolve civil cases in the Western District of Texas is less than the time in this district. See, for example, *Federal Judicial*

*Caseload    Statistics    2005*    (Mar. 31, 2005),    Table    C-5,    *available    at*
www.uscourts.gov/caseload2005/tables/C05mar05.pdf.  (Tab E).  For example, during the period
ending March 31, 2005, the median time from filing to disposition of civil cases was 10 months
in the District of Columbia, as compared to 9.4 months in the Western District of Texas.  *Id.*
Transfer would occasion no delay.

8.    <u>Familiarity with applicable law.</u>

This case involves ERISA, a federal statute.  It does not involve questions of District of
Columbia law or any other law that is unique to this district.  To Defendants' knowledge, transfer
would not create any conflict of law issues or the necessity for the transferee court to apply
foreign law.  Both this Court and the transferee court would be familiar with ERISA law, and
transfer would pose no unusual issues to a federal court in the Western District of Texas.  In
short, there is nothing about the applicable law that militates against transfer.

9.    <u>Local interest in deciding the controversy.</u>

This is not a local controversy.  The District of Columbia has no local interest in deciding
this case.  No party resides here.  The Plaintiffs are from Illinois, California, and Connecticut.
No witnesses who have been identified have any connection to this forum or reside here.  The
District of Columbia has no meaningful ties to this controversy or any particular interest in the
parties or in the subject matter.  Indeed, very few members of the putative nationwide class
reside in the District of Columbia.  For example, based on January 1, 2005 figures, of the
158,419 active participants in the Plan, only 17 reside in the District.  This is approximately
1/100 of 1% of active participants ($17/158,419 = .000107$).  Huang Aff. ¶ 4.  In contrast, 32,588
active participants live in Texas (approximately 20.6%).  *Id.*  Similarly, of the 194,066 inactive
participants in the Plan nationwide, only 50 live in the District.  This is less than 3/100 of 1% of

the inactive participants (50/194,068 = .000257).  *Id.* ¶ 5.  In short, this controversy touches very few in the District of Columbia, and there is no local interest that would be impaired by the transfer of this case.

In contrast, the Western District of Texas has a strong local interest in the controversy, as the Plan is administered there and both Defendants are headquartered there.  As such, the headquarters of both Defendants in the Western District of Texas is the situs and local epicenter of the material events that Plaintiffs have placed at issue.  Moreover, this case potentially affects the thousands of current and inactive participants in the Plan who reside in the Western District of Texas.  *Id.* ¶¶ 4, 5.  For all of these reasons, the Texas court has a substantial interest in the resolution of the claims of this lawsuit, and the case should be transferred there.

> 10.    Other practical aspects.

Finally, the interests of justice suggest that the matter should be transferred to the Western District of Texas for adjudication so that the Plan is more likely to be subject to uniform decisions interpreting ERISA.  Indeed, this Court, on a number of occasions has indicated that uniform interpretations of the complex ERISA law are vital to the efficient administration of funds.  *E.g., Tri-State*, 357 F.Supp.2d at 58; *Flynn*, 310 F.Supp.2d at 194.  This favors transfer to the Western District of Texas where the Plan is administered.

*    *    *

In sum, the factors tilt strongly in favor of transferring this case to the Western District of Texas.  The Plan is administered there, and key functions related to the Plan have been and are performed there.  Plaintiffs have no connection to the District of Columbia, and because the District of Columbia has no meaningful ties to the controversy, the Court should give little or no deference to Plaintiffs' choice of forum.  If the case is not dismissed, it should be transferred.

IV.    **IN ANY EVENT, THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

Of the claims asserted, it is clear that Plaintiffs are not entitled to the relief they seek and have failed to state a claim. That failure is made clear by a comparison of the facts alleged by Plaintiffs to the language of the ERISA statute.

A.    **ERISA's Relevant Framework**

1.    ERISA and Its Age Discrimination Provisions.

ERISA was enacted in 1974 to govern employee benefit plans established by employers. *See* 29 U.S.C. §§ 1001-1461. ERISA does not mandate that employers give any particular retirement plan or benefit to employees. However, ERISA sets forth minimum standards and safeguards with respect to the establishment, operation, and administration of any retirement plan that is established by an employer for its employees. 29 U.S.C. § 1001(a).

Section 204(b)(1)(H) of ERISA, which is the basis of four of Plaintiffs' five counts in the Complaint, was not originally part of ERISA when it was enacted in 1974. ERISA initially did not require that a pension plan allow employees who work beyond normal retirement age to continue earning pension benefits. *See* H.R. Rep. No. 99-1012, at 378 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4023. Congress amended ERISA, the Age Discrimination in Employment Act ("ADEA"), and the Internal Revenue Code in the Omnibus Budget Reconciliation Act of 1986 ("OBRA '86") to change this. The ERISA amendment appears in ERISA § 204(b)(1)(H), which states in pertinent part that:

> [A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i).[9/]

ERISA § 204(b)(1)(G), which is the basis of Plaintiffs' fifth count, was included as part of ERISA when it was originally enacted in 1974.  That section provides:

> [A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of any increase in his age or service.

29 U.S.C. § 1054(b)(1)(G).

2.    Cash Balance Plans.

ERISA regulates two types of retirement plans: defined contribution plans and defined benefit plans.  29 U.S.C. § 1002(34), (35).  In a defined contribution plan, contributions are allocated to a separate individual account for each participant, and the participant's retirement benefit at any given time (i.e., his "accrued benefit") is the balance of that account, increased or decreased by investment earnings/losses.  29 U.S.C. § 1002(34), (23)(B).  A defined benefit plan is any retirement plan that is not a defined contribution plan.  29 U.S.C. § 1002(35).  A traditional defined benefit formula produces a participant's retirement benefit under a formula based on a participant's years of service and compensation (Compl. ¶¶ 28-29), and the participant's retirement benefit at any given time (i.e., his accrued benefit) is expressed in the form of an annual benefit beginning at age 65.  29 U.S.C. § 1002(23)(A), (24).

A "cash balance plan" is a hybrid type of plan with characteristics of both a defined contribution plan and a defined benefit plan.  In a cash balance plan, a hypothetical account is established for each participant to which is allocated pay and interest credits similar to a defined contribution plan.  Treas. Reg. § 1.401(a)(4)-8(c)(3).  However, a cash balance plan is not a

---

[9/]    The amendments simultaneously made to the Internal Revenue Code and the ADEA use virtually identical language.  See I.R.C. § 411(b)(1)(H); 29 U.S.C. § 623(i).  The OBRA '86 Conference Report states that all three provisions "are to be interpreted in a consistent manner."  H.R. Rep. No. 99-1012, at 378.

defined contribution plan; it is a defined benefit plan. *Id.* The participant's retirement benefit in a cash balance plan is not the accumulated value of his cash balance account as it would be if the plan were a defined contribution plan. Instead it is the annual benefit beginning at age 65 that the participant's account balance will "buy." Treas. Reg. § 1.401(a)(4)-8(c)(3)(vi).

### B.   Plaintiffs' Complaint -- Summary Of Facts[10/]

#### 1.   The Plans.

Plaintiffs Reed J. Newlin, Octavia Kinchloe, and Doreen Lew (the "Former Employee Plaintiffs") are former employees of AT&T Inc. or one of its affiliates, and Plaintiff Bradford J. Parsons is a current employee of AT&T. Compl. ¶¶ 19-22, 26. Plaintiffs challenge provisions of the "SBC Plan," the former Ameritech Management Pension Plan (the "Ameritech Plan"), the former Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees (the "PTG Plan"), and the former Southern New England Telecommunications Corporation Management Pension Plan (the "SNET Plan"). The Ameritech Plan, the PTG Plan, and the SNET Plan have all been merged into the SBC Plan and no longer survive as independent plans (collectively, the Ameritech Plan, the PTG Plan, and the SNET Plan are referred to as the "Merged Plans," and the SBC Plan and the Merged Plans are referred to as the "Plans"). *Id.* ¶ 3. The Former Employee Plaintiffs participated in the SBC Plan or one of the Merged Plans during their employment with AT&T and have received their benefits from the respective Plan. *Id.* ¶¶ 19-21.

#### 2.   The Plans' Conversion to Non-Traditional Benefit Formulas.

The SBC Plan, including each of the Merged Plans, is a defined benefit pension plan within the meaning of ERISA. *Id.* ¶¶ 23, 24. Prior to an amendment of each plan, participants'

---

[10/] It is assumed for purposes of this motion to dismiss that the facts as pled in Plaintiffs' Complaint are true, although many of those alleged facts are incorrect and contested.

retirement benefits were calculated under a "traditional" defined benefit formula. *Id.* ¶¶ 28, 55, 75, 86. Under this traditional formula, a participant's retirement benefit was determined by multiplying his years of service and his compensation by a percentage and expressed as a monthly benefit beginning at age 65. *Id.* ¶¶ 28, 55.

The SBC Plan, the PTG Plan, and the SNET Plan were amended on June 1, 1997, July 1, 1996, and January 1, 1996, respectively to change the traditional benefit formula to a "cash balance" formula. *Id.* ¶¶ 30, 75, 86. Under the new cash balance plan, a hypothetical account was established for each participant to which was credited an initial "opening balance" (determined under a formula discussed under the Opening Balance Formulas below). The SBC Plan and the PTG Plan also gave the participants additional transition benefits (the SBC Plan's transition benefits are described under the SBC Plan Transition Benefit Formula below). In addition to the participant's opening balance in each Plan and the transition benefits for participants in the SBC Plan and the PTG Plan, each participant's cash balance account was increased on a pay period or monthly basis by a percentage of the participant's compensation for the period and with an interest credit for the period. *Id.* ¶¶ 32-34, 75, 87-88.

The Ameritech Plan was amended on May 1, 1995, to change the traditional benefit formula to a "pension equity" formula. *Id.* ¶ 55. Under this pension equity formula, each participant was credited with an opening "defined lump sum benefit" (described under the Opening Balance Formulas below). *Id.* ¶¶ 56-58. In addition, each participant was allocated a pension credit (i.e., a percentage from 6% to 20%) each month based on the participant's age (the older the participant, the higher his pension credit), and the participant's age-65 retirement benefit was determined by multiplying his accumulated monthly pension credits by his "final average pay" and expressed as a defined lump sum. *Id.* ¶ 56.

Notwithstanding that a hypothetical account was established under the cash balance plans for each participant in which his opening balance and accumulated pay and interest credits were expressed as a dollar amount in his account, the participant's retirement benefit was not the account's dollar balance. Instead each participant's retirement benefit continued to be an age-65 annuity, specifically the annuity beginning at age 65 that the accumulated amount in the participant's cash balance account would "buy." *Id.* ¶¶ 69, 82, 89. Similarly, under the Ameritech Plan's pension equity formula, notwithstanding that a participant's benefit was expressed as a defined lump sum, the participant's retirement benefit was the age-65 monthly annuity that his defined lump sum would "buy." *Id.* ¶ 56.

3.    The Opening Balance Formulas.

Each of the Plans credited the participants with an "opening balance" when the respective Plan was converted from the traditional benefit formula. For each participant in the SBC Plan and the SNET Plan, the opening balance was equal to the present value of the participant's age-65 accrued benefit calculated under the Plan's traditional formula as of the date of the conversion. *Id.* ¶¶ 31, 87.

Each PTG Plan participant's opening balance was approximately equal to the balance that would have been in the account had the participant been under the cash balance formula since his date of hire. *Id.* ¶ 76. This "always cash balance" opening account balance was higher for many participants than the participants' actual accrued benefit and was significantly higher for many younger participants. *Id.* ¶¶ 79-80.

The Ameritech Plan participants were each credited with an opening defined lump sum (DLS) benefit. *Id.* ¶¶ 57, 58. This opening DLS benefit was calculated by computing what each participant's DLS would have been had he been under the pension equity formula for his whole

career (the "always DLS" benefit). *Id.* ¶ 58. The always DLS benefit may have been more or less than the participant's benefit that he had accrued under the prior traditional formula and was larger for many younger participants and smaller for many older participants. *Id.* ¶ 58.

4.     The SBC Plan Transition Benefit Formula.

In addition to the opening balance, each SBC Plan participant employed on both March 31, 1997, and June 1, 1997, was entitled to an additional "Transition Benefit" when the Plan was converted to a cash balance plan. *Id.* ¶ 35. The Transition Benefit was calculated as follows: First, it was determined what the participant's cash balance would have been had he been under the cash balance formula for his whole career (the "always cash balance amount"); then the participant was credited with an additional percentage of his compensation (from 0% up to a maximum of 125% of compensation) based on his age and his years of service as of June 1, 1997;[11] and, finally, the participant's opening cash balance amount (i.e., the present value of his accrued benefit as of June 1, 1997, under the old formula) that had been credited to his cash balance account was subtracted from the total of the always cash balance amount and the additional age and service amount to produce the participant's Transition Benefit (with a minimum benefit of $500). *Id.* ¶¶ 36-39. Thus the Transition Benefit formula provided new accruals over and above what the participants had accrued under the prior formula. *Id.* ¶ 48.

---

[11] Under the formula, each participant was allocated points for his age and points for his years of service. If the total of a participant's age and service points equaled or exceeded a certain number, he was entitled to an additional percentage of pay (up to a maximum of 125% of pay) as follows: (i) up to (but not exceeding) 25 points, he was entitled to no additional pay; (ii) from 25 points through 40 points, he was entitled to an additional 1% of pay for each point over 25 up through 40; (iii) from 41 points through 50 points, he was entitled to an additional 15% of pay plus 3% of pay for each point over 40 up through 50; and (iv) over 50 points, he was entitled to an additional 45% of pay plus 5% of pay for each point over 50 (up to a maximum total of 125% of pay). *Id.* ¶¶ 38-39.

5.    The CAM Benefit and Lump Sum Form of Payment Under the SBC Plan and the Ameritech Plan.

Effective June 14, 2001, the SBC Plan and the Ameritech Plan were again amended to add the Career Average Minimum ("CAM") benefit. *Id*. ¶ 62. The CAM benefit was determined under a formula based on the participant's years of service and compensation and expressed as a monthly benefit beginning at age 65, in a manner similar to the traditional formula under each plan, with a new minimum monthly benefit. *Id*. ¶¶ 62-63. Thus, after the addition of the CAM benefit, each SBC Plan participant was entitled to a retirement benefit equal to the greater of his cash balance benefit or his accrued benefit under the prior traditional formula (but not less than the CAM minimum benefit), and each Ameritech Plan participant was entitled to a retirement benefit equal to the greater of his DLS benefit or his accrued benefit under the prior traditional formula (but not less than the CAM minimum benefit). *Id*. ¶¶ 65-66.

When the CAM benefit was added to the SBC Plan and the Ameritech Plan, an optional lump sum form of benefit was offered in the case of a CAM benefit that exceeded the participant's cash balance benefit (in the SBC Plan) or pension equity benefit (in the Ameritech Plan) by less than $400 per month. *Id.* ¶ 64. If the CAM benefit exceeded this $400 per month threshold, the lump sum option was not available. *Id.* ¶ 64.

C.    **Plaintiffs' Counts**

Plaintiffs allege four counts claiming that the cash balance and pension equity provisions of the Plans violate the age discrimination standard set forth in ERISA § 204(b)(1)(H) and a fifth count asserting that the lump sum form of benefit offered under the CAM benefit violates the age

discrimination standard set forth in ERISA § 204(b)(1)(G):[12]

    **Count One**    Plaintiffs complain that the Transition Benefits under the SBC Plan violate the age discrimination standard set forth in ERISA § 204(b)(1)(H). Compl. ¶¶ 96-100.

    **Count Two**    Plaintiffs complain that the opening DLS formula in the Ameritech Plan violates the age discrimination standard set forth in ERISA § 204(b)(1)(H). *Id.* ¶¶ 101-105.

    **Count Three**    Plaintiffs complain that the opening cash balance formula in the PTG Plan violates the age discrimination standard set forth in ERISA § 204(b)(1)(H). *Id.* ¶¶ 106-110.

    **Count Four**    Plaintiffs complain that the cash balance formulas in the SBC Plan, the PTG Plan, and the SNET Plan and the pension equity formula in the Ameritech Plan all violate the age discrimination standard set forth in ERISA § 204(b)(1)(H). *Id.* ¶¶ 111-115.

    **Count Five**    Plaintiffs complain that the lump sum distribution option available under the CAM benefit violated the age discrimination standard set forth in ERISA § 204(b)(1)(G). *Id.* ¶¶ 116-122.

In addition, the Former Employee Plaintiffs are claiming in this lawsuit that the SBC Plan owes

---

[12] Plaintiffs also claim that the SBC Plan and the Merged Plans violate § 411(b)(1)(H) and (G) of the Internal Revenue Code. Compl. ¶¶ 99, 104, 109, 114, and 119. The referenced sections of the Internal Revenue Code are virtually identical to the corresponding ERISA section. *Compare* ERISA § 204(b)(1)(H) with I.R.C. § 411(b)(1)(H) and ERISA § 204(b)(1)(G) with I.R.C. § 411(b)(1)(G). Therefore, only the ERISA sections and not the Internal Revenue Code sections will be referenced herein. However, the Treasury regulations issued under § 411 of the Internal Revenue Code are also interpretative authority for § 204 of ERISA. 29 U.S.C. § 1054(b)(1)(H)(vi), 1202(c); I.R.C. § 411(b)(1)(H)(v). Therefore, the Treasury Regulations will be cited herein as authoritative interpretation of ERISA § 204(b)(1)(H) and (G), where applicable. To the extent Plaintiffs are seeking a remedy for violations of the referenced Internal Revenue Code sections other than any remedy provided under ERISA for violation of the corresponding ERISA sections, however, Plaintiffs have no standing to obtain any such remedy. *See Reklau v. Merchs. Nat'l Corp.*, 808 F.2d 628 (7th Cir. 1986).

them additional benefits.  *Id.* ¶¶ 19-21; Prayer for Relief ¶ G.[13/]

**D.    Each Of Plaintiffs' Counts Should Be Dismissed For Failure To State A Claim**

When the specific counts of the Plaintiffs' Complaint are analyzed against the statutory provisions they rely upon, it is clear none states a claim upon which relief can be granted.

1.    Count Four Must Be Dismissed As Neither The SBC Plan's, The Ameritech Plan's, The PTG Plan's, Nor The SNET Plan's Ongoing Cash Balance Or Pension Equity Formula Violates ERISA § 204(b)(1)(H).

Plaintiffs' Count Four claims that the cash balance formulas in the SBC Plan, the PTG Plan, and the SNET Plan, and the pension equity formula in the Ameritech Plan, all violate ERISA § 204(b)(1)(H).  Compl. ¶ 114.  Plaintiffs' sole basis for this argument is that ERISA § 204(b)(1)(H) requires that the "rate of benefit accrual" for purposes of judging age discrimination under that section be measured in terms of a participant's accrued benefits—that is, by looking at changes in the participant's age-65 annuity—and not by changes in credits to the participant's account.  *Id.* ¶¶ 49-50, 67-69, 82-83, 89.  Plaintiffs are not correct.

---

[13/] A judgment for money representing "additional benefits" would not be available as a matter of law even if these Plaintiffs prevailed on their claims and the Court ordered reformation of the Plan.  ERISA § 502(a)(1)(B) provides the only cause of action for additional benefits from a plan.  *See* 29 U.S.C. § 1132(a)(1)(B).  But, as the court of appeals in this circuit has held, the determination of the amount of each individual's benefit under the reformed Plan must be made, in the first instance, by the Plan fiduciary charged with the discretionary authority to interpret the Plan and determine benefits.  *Commc'ns Workers of Am. v. AT&T*, 40 F.3d 426 (D.C. Cir. 1994).  Even if the Plan were reformed to reinstate the prior traditional formula (i.e., the monthly benefit), each Plaintiff's benefit would have to be individually determined and would require the interpretation of various Plan terms (such as "Pension Calculation Service" and "Pension Compensation") and factual determinations regarding each Plaintiff's length of service, age, and compensation.  Plaintiffs admit that the Plan and the law would require them to exhaust administrative remedies before they would be entitled to additional benefits, but they contend that any resort to the Committee would be futile and, therefore, exhaustion is not required.  Compl. ¶¶ 14-18.  Plaintiffs' preemptive exhaustion argument in the Complaint though is addressed to futility as it would apply to a requirement to exhaust administrative remedies prior to filing this suit for reformation.  *Commc'ns Workers of Am.*, 40 F.3d. at 432.  While Plaintiffs may not have an exhaustion requirement prior to bringing a suit for Plan reformation, the exhaustion requirement would naturally apply if this Court reformed the Plan.  At that point, Plaintiffs, like all other participants, must request benefits under the terms of the reformed Plan and, if denied, complete the Plan's administrative procedural requirements before filing suit.  *Id.*

a.     ERISA Does Not Require That The Rate Of Benefit Accrual Be Measured In Terms Of A Participant's Age-65 Accrued Benefit In A Cash Balance Plan As Plaintiffs Contend

ERISA § 204(b)(1)(H) provides that a defined benefit plan will not satisfy the age discrimination standard in that section if "under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." ERISA § 204(b)(1)(H)(i). It is evident from the Complaint that the pay and interest credits allocated to participants' accounts do not decrease with age. Compl. ¶¶ 32-33, 56, 75, 87-88, 92-94. Nonetheless, Plaintiffs argue that a participant's rate of benefit accrual must be measured not in terms of the amount of current pay credits or current interest credits but in terms of the amount of the annual benefit beginning at the participant's normal retirement age (age 65). *Id.* ¶¶ 49-50, 67-69, 82, 89. Thus, according to Plaintiffs, because the same dollar amount allocated to two participants of a different age in the Plans translates into a greater annuity beginning at age 65 for the younger participant than the older participant, the formula causes the rate of the participant's benefit accrual to be reduced because of age in violation of § 204(b)(1)(H). *Id.* If Plaintiffs are correct that ERISA's age discrimination statute requires a participant's rate of benefit accrual to be measured solely in terms of the value of the age-65 annuity, then the Plans all would violate ERISA—and so would every single other cash balance plan in existence. All other things being equal, a pay credit for a younger employee always adds more to the value of an annuity payable at age 65 than an identical pay credit for an older employee, as the younger employee's pay credit has more time than the older employee's pay credit to earn interest. This is the case if the younger employee is 25 and the older employee is 55 or if the younger employee is 25 and the older employee is 26. This effect is inherent in virtually every cash balance plan and pension equity plan design.

Every court but one[14] that has addressed the question has recognized the absurdity of this result and has accordingly rejected Plaintiffs' argument and held that a participant's rate of benefit accrual for purposes of ERISA's age provisions does not have to be measured solely in terms of the value of an annuity payable at normal retirement age and, in fact, that measurement is not appropriate for a cash balance plan.

In *Register v. PNC Financial Services Group, Inc.*, No. 04-CV-6097, 2005 U. S. Dist. LEXIS 29678 (E.D. Pa. Nov. 21, 2005) (Tab F), plaintiffs were current and former employees who claimed that the cash balance plan in which they participated violated § 204(b)(1)(H) because the same dollar amount allocated to two different employees' cash balance accounts always buys for the younger employee a larger monthly benefit payable in the form of an annuity beginning at age 65 than it buys for the older employee and hence "the rate of an employee's benefit accrual is reduced because of the attainment of any age." *Id.* at *14 (quoting § 1054(b)(1)(H)). The court in *Register* dismissed plaintiffs' claim and held that the rate of benefit accrual in a cash balance plan is determined by a change in the account balance, not by a change in the participant's accrued benefit:

> Whether or not a cash balance plan violates [ERISA § 204(b)(1)(H)] turns on the statutory interpretation. The issue is whether "the rate of an employee's benefit accrual" for a cash balance plan refers [1] to the change in the benefit payable in the form of an annuity that commences at age 65 or [2] to the annual amount credited to the employee's cash balance account.
> . . .
> The concept of the benefit accrual rate does not have a single self-evident meaning. Cash balance plans accrue benefits differently than traditional defined benefit plans. Under a traditional defined benefit plan, the benefits are defined in terms of the age 65 annuity. Therefore, it follows logically that the rate of benefit

---

[14] The one case that answered the question as to whether a cash balance plan violates ERISA § 204(b)(1)(H) in the affirmative is *Cooper v. IBM Pers. Pension Plan*, 274 F.Supp.2d 1010, 1022 (S.D. Ill. 2003) (holding that the rate of benefit accrual under ERISA § 204(b)(1)(H) must be measured by a change in the participant's age-65 annuity and that the cash balance plan violated § 204(b)(1)(H) by its design), *appeal docketed*, No. 05-3588 (7th Cir. Sept. 9, 2005).

accrual is the change in the accrued benefit. Cash balance plans are not defined in terms of an age 65 annuity, rather they are defined in terms of an account balance that grows with pay credits and interest. Therefore, it follows logically that the rate of benefit accrual is determined by the change in the account balance.

*Id.* at *14, *22-23 (citations omitted).

In *Tootle v. ARINC, Inc*., 222 F.R.D. 88 (D. Md. 2004), plaintiff, a former employee, brought an action on behalf of a similarly situated class challenging his employer's conversion of its traditional defined benefit plan to a cash balance plan. Plaintiff argued that the cash balance plan violated ERISA § 204(b)(1)(H) because a participant's rate of benefit accrual decreases based on a participant's age. The court dismissed plaintiff's claim stating:

> The claim of age discrimination [in a cash balance plan] arises because money contributed to a younger employee will be worth more (when expressed as an annuity starting at age 65) than the same amount of money contributed to an older employee, because the contribution to the younger employee will have more years to accrue interest before normal retirement age. . . .
> . . .
> Applying the ERISA provisions designed for traditional defined benefit plans to cash balance plans could lead to illogical results, as illustrated in this case. On its face, the terms of the ARINC cash balance plan appear to favor older employees. All employees are entitled to regular interest credits at the same guaranteed rate, the regular contribution credits are based on a percentage of an employee's salary that increases with age, and the transition credits were provided on terms slightly more favorable to older employees. The potential claim of age discrimination arises only by applying a definition for accrued benefits which does not fit with the way cash balance plans are structured. The more sensible approach is to measure benefit accrual under cash balance plans by examining the rate at which amounts are allocated and the changes over time in an individual's account balance, as the ERISA provisions designed for traditional defined contribution plans would direct. . . .

*Id*. at 92-94.

In *Eaton v. Onan Corp*., 117 F.Supp.2d 812 (S.D. Ind. 2000), plaintiffs were participants in their employer's cash balance plan claiming that the cash balance plan violated ERISA § 204(b)(1)(H) because a participant's rate of benefit accrual decreases based on a participant's age. The court found as a matter of law that the cash balance plan did not violate ERISA

§ 204(b)(1)(H) because the rate of benefit accrual was measured by the change in a participant's cash balance account, not by a change in the participant's age-65 accrued benefit:

> [T]he court does not believe that [the provisions of ERISA § 204(b)(1)(H)] *require* that the rate of benefit accrual be measured *solely* in terms of change in value of an annuity payable at normal retirement age. Plaintiffs' proposed interpretation would produce strange results totally at odds with the intended goal of the OBRA 1986 pension age discrimination provisions. There is no statutory or public policy reason that the rate of benefit accrual could not be measured, at least for these purposes, in terms of the rate of change in the balance of an employee's hypothetical account. In fact, that measure provides a precise, quantifiable, and clear measure that does not require any estimates or actuarial assumptions.

117 F.Supp.2d at 826.

An examination of the legislative history of OBRA '86 relating to the adoption of ERISA § 204(b)(1)(H) further supports the conclusion that the rate of benefit accrual does not have to be measured in terms of an age-65 annuity—and in fact a measurement on that basis makes no sense as it could not possibly be the measure for employees who work beyond age 65. The Conference Report under OBRA '86 illustrates the application of the new ERISA § 204(b)(1)(H) with an example that involves a pension plan with a normal retirement age of 65 and a benefit formula that provides a retirement annuity of $10 per month multiplied by the employee's years of service to the employer. H.R. Rep. No. 99-1012 , at 381. As the Conference Report explains, the employee in the example must receive a benefit of $100 per month if he retires at age 65, $110 per month is he retires at age 66, $120 month, if he retires at age 67, and so on. *Id.* The adoption of Plaintiffs' argument that the age discrimination provision of § 204(b)(1)(H) must be measured by a participant's age-65 annuity would make the example in the Conference Report illegal—that cannot be correct. *See Eaton*, 117 F.Supp.2d at 834 (stating that an age-65 annuity measure "makes no sense when calculating the rate of benefit accrual for participants older than 65, who were the principal intended beneficiaries of the legislation" and is "contrary to the clear

legislative purpose behind the OBRA legislation—to ensure that employers did not stop providing employees with pension benefits if the employees choose to work beyond normal retirement age").

Finally, the stated opinion of the Department of the Treasury, which has been given the ultimate authority to interpret § 204 of ERISA (*see* 29 U.S.C. § 1054(b)(1)(H)(vi)), has consistently been that cash balance plans are not age discriminatory and the rate of benefit accrual is measured by additions to the cash balance account. *See, e.g.*, U.S. Dep't of Treasury, General Explanations of the Administration's Fiscal Year 2006 Revenue Proposals 82 (2005) (stating that "cash balance plans and cash balance conversions are not inherently age-discriminatory"); 56 Fed. Reg. 47,524, 47,528 (Sept. 19, 1991) (preamble to Treasury regulations stating that the "fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation will not cause a cash balance plan to fail to satisfy the requirements" of I.R.C. § 411(b)(1)(H) (the parallel to ERISA § 204(b)(1)(H))); 67 Fed. Reg. 76,123 (Dec. 11, 2002) (providing that the rate of benefit accrual under a cash balance plan is measured by additions to the cash balance account).[15]

Clearly the ongoing cash balance and pension equity formulas in the Plans do not violate ERISA § 204(b)(1)(H) simply because a dollar allocated to a younger employee will always be worth more than a dollar allocated to any other older employee, and Plaintiffs' Count Four must be dismissed.

---

[15] These proposed Treasury regulations were withdrawn on June 15, 2004 to give Congress an opportunity to consider its legislative proposal relating to cash balance plans.

b.   ERISA § 204(b)(1)(H) Applies Only To Employees Who Work After The Age of 65

Plaintiffs' age discrimination theory of Count Four also fails as a matter of law because ERISA § 204(b)(1)(H) was not intended to be applied to employees who have not yet reached normal retirement age. The legislative history of OBRA '86 relating to the adoption of ERISA § 204(b)(1)(H) lends powerful and explicit support to this conclusion. Under the heading "Reasons for Change," the Conference Report explains that the OBRA '86 provisions were adopted in order to resolve the ongoing uncertainty over whether it was lawful to cut off further pension accruals for employees who work past normal retirement age. *See* H.R. Rep. No. 99-1012, at 378. The Conference Report states that the OBRA '86 provisions ended this uncertainty by requiring that "benefit accruals . . . may not be reduced or discontinued on account of the attainment of a specified age." *Id.* The Conference Report also suggests that § 204(b)(1)(H) was intended to apply only to benefit accruals earned *after* normal retirement age:

> Under the conference agreement, the rules preventing the reduction or cessation of benefit accruals on account of the attainment of age *are not intended to apply in cases in which a plan satisfies the normal benefit accrual requirements for employees who have not attained normal retirement age.*

*Id.* at 379 (emphasis added). This understanding of the scope of ERISA § 204(b)(1)(H) is also reflected in the title of the counterpart provision in the Internal Revenue Code, which states that the provision addresses "Continual accrual *beyond normal retirement age.*" I.R.C. § 411(b)(1)(H) (emphasis added). Thus the legislative history of ERISA § 204(b)(1)(H) clearly suggests that the provision was intended to cover only employees working beyond normal retirement age and only accruals earned beyond that age.

Several courts have been persuaded by this very strong suggestion in the legislative history and have concluded that ERISA § 204(b)(1)(H) applies only to employees working beyond normal retirement age. *Campbell v. Bank Boston, N.A.*, 327 F.3d 1, 10 (1st Cir. 2003)

- 37 -

(while finding it unnecessary to resolve the issue, stating that ERISA § 204(b)(1)(H) may not even apply to employees younger than normal retirement age); *Tootle*, 222 F.R.D. at 93 (finding that the age discrimination provision was not intended to protect workers until after they attain normal retirement age); *Eaton*, 117 F.Supp.2d at 815 (concluding that ERISA § 204(b)(1)(H) did not apply to employees who had not yet reached normal retirement age).[16/]

There are no facts in the Complaint to establish that the Plaintiffs worked beyond normal retirement age to fall into a category of individuals covered by ERISA § 204(b)(1)(H). Therefore, Plaintiffs' Count Four must also be dismissed for this reason.

> 2.    Counts Two And Three Must Be Dismissed As Neither The Opening DLS Benefit Formula Under The Ameritech Plan Nor The Opening Account Balance Formula Under The PTG Plan Violates ERISA § 204(b)(1)(H).

Plaintiffs claim in Counts Two and Three that the opening account balance formulas in the Ameritech Plan and the PTG Plan reduce the rate of an employee's benefit accrual based on age in violation of ERISA § 204(b)(1)(H), first, because the opening account formulas result in a grant of a new accrued benefit that is greater for younger participants than for older participants and violate § 204(b)(1)(H) on what Plaintiffs term a "nominal basis" and, second, because the opening benefit formulas produce an amount that buys a higher age-65 annuity for younger employees than the same amount buys for older employees and violates § 204(b)(1)(H) on an "age-65 basis." Compl. ¶¶ 103, 108. Neither is correct.

> a.    The Opening Benefit Formulas Do Not Violate § 204(b)(1)(H) On A Nominal Basis

The opening benefit formulas under the Ameritech Plan and the PTG Plan credit each participant with an opening benefit determined as if the new benefit formula (i.e., the cash

---

[16/] One district court recently rejected the notion that ERISA § 204(b)(1)(H) was intended to apply only to participants who have reached age 65. *See Wells v. Gannett Ret. Plan*, 385 F.Supp.2d 1101, 1102 (D. Col. 2005).

balance formula in the PTG Plan and the pension equity formula in the Ameritech Plan) was in place for the participant's entire career.  *Id.* ¶¶ 58, 76.  Plaintiffs appear to be claiming in their nominal basis argument that the opening benefit formulas resulted in a *new additional* accrued benefit that was greater for younger participants than for older participants and, therefore, resulted in a rate of benefit accrual that was reduced on account of age in violation of ERISA § 204(b)(1)(H)[17/]  *Id.* ¶¶ 58-59, 79-80.  Plaintiffs' argument is a futile attempt to rewrite ERISA § 204(b)(1) to cover a rate of benefit accrual reduction that is not prohibited.

The benefit a participant derived under the applicable opening benefit formula depended on the amount of the participant's accrued benefit on the date of the conversion.  *Id.* ¶¶ 58, 79-80.  The higher a participant's accrued benefit on the date of the conversion, the lower his new added benefit under the opening benefit formulas.  *Id.*  The net benefit derived from the opening benefit formulas, therefore, was increased or decreased not on account of a participant's age but on account of the participant's accrued benefit on the date of the conversion.  That existing accrued benefit in turn depended on the participant's compensation and service as of the conversion date (because the accrued benefits were all derived under the traditional formula in the respective Plan, which was based on a participant's years of service and compensation).  *See Id.* ¶¶ 28, 55.  Accordingly, many older participants had higher accrued benefits on the date of the conversion because they had worked longer and had more time to accrue greater benefits and, therefore, lower net benefit from the opening benefit formulas.  Thus the rate of benefit accrual did not decrease because of the attainment of any age; rather, the rate decreased because of the

---

[17/] Plaintiffs' "nominal basis" argument is not precise.  On occasion, Plaintiffs equate their reference to nominal basis as synonymous with "present value" basis (Compl. ¶¶ 103, 108) and in other instances refer to their nominal basis argument as an immediate increase in their accrued benefit (*Id.* ¶¶ 58, 79).  Thus Defendants assume that Plaintiffs are complaining in their nominal basis argument that younger employees got a bigger increase than older employees in the present value of their accrued benefits when expressed as a cash balance or defined lump sum dollar amount through the opening benefit formulas.

participant's prior service.  ERISA § 204(b)(1)(H) prohibits the reduction of a rate of benefit accrual "because of the attainment of any *age*."  It does *not* prohibit the reduction of a rate of benefit accrual because of a participant's increased service.  *See* 29 U.S.C. § 1054(b)(1)(H)(ii)("A plan shall not be treated as failing to meet the requirements of [§ 204(b)(1)(H)] solely because the plan imposes (without regard to age) a limitation . . . on the number of years of service . . . which are taken into account for purposes of determining benefit accrual under the plan.").  The court in *Eaton* made the point clearly:

> Congress expressly permitted the rate of benefit accrual (however it is measured) to decline over time as long as the decline is tied to the participant's years of service rather than the participant's age (and despite the one-to-one correlation of age and years of service).

117 F.Supp.2d. at 831-32.[18/]  The opening balance formulas of the Ameritech Plan and the PTG Plan do not violate ERISA § 204(b)(1)(H) on a nominal basis.

### b.    The Opening Benefit Formulas Do Not Violate § 204(b)(1)(H) On An Age-65 Basis

Nor do the opening benefit formulas of the Ameritech Plan and the PTG Plan violate ERISA § 204(b)(1)(H) on an age-65 basis.  Plaintiffs contend that those formulas reduce the rate of an employee's benefit accrual based on age because the dollar amount allocated to participants under the formulas will purchase a higher age-65 accrued benefit for a younger participant than it will for any older participant.  Compl. ¶¶ 58-59, 81.  Again, as in Plaintiffs' Count Four, Plaintiffs' argument is based on the premise that the rate of benefit accrual in a cash balance plan must be measured by the increase in the participant's age-65 benefit rather than the increase in

---

[18/] Moreover, the "anti-backloading rule" of ERISA § 204(b)(1)(B) applicable to cash balance plans requires that the rate of benefit accrual may not *increase* based on an employee's service beyond a certain amount.  *See* 29 U.S.C. § 1054(b)(1)(B).  The anti-backloading tests of ERISA § 204(b)(1)(B) prohibit minimal benefit accruals in initial years of employment followed by large benefit accruals as an employee nears retirement.  *Register*, 2005 U.S. Dist. LEXIS 29678, at *9 (citing *Hoover v. Cumberland, Md. Area Teamsters Pension Fund*, 756 F.2d 977, 982 n.10 (3d Cir. 1985).

his cash balance account.  This argument is counter to the weight of judicial authority, the legislative history of § 204(b)(1)(H), the interpretation of the Department of the Treasury and fails for the reasons explained above.

The opening balance formulas of the Ameritech Plan and the PTG Plan do not violate ERISA § 204(b)(1)(H), and Counts Two and Three must be dismissed.

3.    Count One Must Be Dismissed As The Transition Benefits Under The SBC Plan Do Not Violate ERISA § 204(b)(1)(H).

Plaintiffs claim in Count One that the Transition Benefit formula in the SBC Plan reduces the rate of an employee's benefit accrual based on age in violation of ERISA § 204(b)(1)(H) on a "nominal basis" and an "age-65 basis."  Compl. ¶ 98.   Neither argument is legally or logically correct.

a.    The Transition Benefit Formula Does Not Violate § 204(b)(1)(H) On A Nominal Basis

The Transition Benefit formula in the SBC Plan allocates additional benefits to participants over and above the value of the participants' accrued benefits on the date of the cash balance conversion and produces an amount that incrementally *increases* as a participant's age and service years increase.  *Id.* ¶¶ 35-38, 38.  Presumably Plaintiffs' are arguing in their nominal basis argument that younger employees received larger *new* accrued benefits when expressed as a cash balance dollar amount through the Transition Benefit formula than older employees and thereby violates ERISA § 204(b)(1)(H).  *See* Compl. ¶¶ 52, 98.  Yet Plaintiffs' example in their Complaint illustrating the effect of the Transition Benefit formula shows clearly that the older participant received a greater Transition Benefit on a nominal basis.  *Id.* ¶ 48.  In fact, Plaintiffs state that "it is evident from the example that the 40-year-old was awarded a TBA credit that was *nominally* larger than the TBA credit awarded to the 30-year-old participant."  *Id.* ¶ 49.  Thus

Plaintiffs' nominal basis argument flies in the face of Plaintiffs' own example illustrating the effects of the Transition Benefit formula and Plaintiffs' own statement in the Complaint.

Moreover, even assuming that the present value of the Transition Benefit was in fact greater for a younger participant than an older participant under the Transition Benefit formula, the formula still does not violate ERISA § 204(b)(1)(H) under Plaintiffs' nominal basis theory. The amount of a participant's Transition Benefits was *increased* by a percentage (which increased with the participant's age and service) of the participant's compensation (subject to a cap of 125% of compensation) and, as with the opening balance formulas in the Ameritech Plan and the PTG Plan, *decreased* by the present value of his accrued benefit on the date of the conversion. Compl. ¶¶ 38, 44-48. Therefore, any decrease (or non-increase) in a participant's Transition Benefit resulted only from the participant's service (because his accrued benefit calculated under the traditional formula on the date of the conversion was based on his service) or from the maximum limit imposed on the Transition Benefits. Neither violates ERISA § 204(b)(1)(H). A rate of benefit accrual that decreases on account of a participant's service is not a violation of ERISA § 204(b)(1)(H), which only proscribes a decrease "based on age." *See Eaton*, 117 F.Supp.2d at 831-32. Moreover, a cap imposed on the maximum amount of benefits that will be given under a plan formula does not violate ERISA § 204(b)(1)(H). *See* 29 U.S.C. § 1054(b)(1)(H)(ii) ("A plan shall not be treated as failing to meet the requirements of [ERISA § 204(b)(1)(H)] solely because the plan imposes (without regard to age) a limitation on the amount of benefits that the plan provides."). The Transition Benefit cap is not imposed with regard to age; it is imposed on all participants. Neither basis for reduction in a participant's Transition Benefit violates § 204(b)(1)(H).

b.     The Transition Benefit Formula Does Not Violate § 204(b)(1)(H) On An Age-65 Basis

The Transition Benefit formula under the SBC Plan also does not violate ERISA § 204(b)(1)(H) on an age-65 basis.  Plaintiffs' age-65 basis argument in Count One is that the Transition Benefit formula reduces the rate of an employee's benefit accrual based on age in violation of ERISA § 204(b)(1)(H) because the dollar amount allocated to participants under that formula, although nominally greater for older participants, will purchase a higher age-65 accrued benefit for a younger participant than it will for an older participant.  Compl. ¶¶ 40-50. However, as discussed under Count Four above, ERISA § 204(b)(1)(H) does not require that the incremental increase in the participants' age-65 annuity be the measure for age discrimination under § 204(b)(1)(H).  Rather, the rate of increase or decrease in the participants' accounts is the appropriate measure in a cash balance plan for determining whether the formula results in an impermissible reduction on account of the attainment of any age.

Thus the Transition Benefit formula does not violate ERISA § 204(b)(1)(H) on either an age-65 basis or a nominal basis, and Plaintiffs' Count One must be dismissed.

4.     Count Five Must Be Dismissed As The Lump Sum Distribution Option Under The SBC Plan And The Ameritech Plan Is Not An Unlawful Forfeiture In Violation Of ERISA § 204(b)(1)(G).

Plaintiffs contend in Count Five that, because the CAM lump sum optional form of benefit was not available to participants whose retirement benefit exceeded a certain threshold (*i.e.*, the CAM excess benefit of $400 per month) and because older participants and participants who worked longer were above that threshold, the provision caused a participant's accrued benefit to be "reduced on account of any increase in his age or service" in violation of § 204(b)(1)(G).  Compl. ¶¶ 118-120.  Plaintiffs' argument fails because the lump sum option is not an "accrued benefit" for purposes of ERISA § 204(b)(1)(G).

A lump sum alternative in a plan is an "optional form of benefit." Treas. Reg. §§ 1.401(a)(4)-4(e)(1); 1.411(d)-4, Q&A-1(b)(1). An optional form of benefit is taken into account in determining the "value" of a participant's accrued benefit. Treas. Reg. § 1.411(a)-11(a)(2). However, under the plain words of the regulation, an optional form of benefit is *not part of* the participant's accrued benefit—rather, it is a form in which a participant's accrued benefit may be distributed from the plan.[19] Treas. Reg. § 1.401(a)(4)-4(e)(1) (defining optional form of benefit as "a distribution alternative" that is available under the plan *with respect to* accrued benefits).[20]

The lump sum option is not part of a participant's accrued benefit, and the dollar limit on its availability does not reduce a participant's accrued benefit on account of age or service in violation of § 204(b)(1)(G). Count Five should be dismissed.

## CONCLUSION

For the reasons stated, this case should be dismissed for lack of personal jurisdiction and improper venue. In the alternative, the case should be transferred to the Western District of Texas pursuant to 28 U.S.C. § 1404(a). In any event, Plaintiffs' claims should be dismissed for failure to state a claim upon which relief can be granted.

---

[19] Plaintiffs cite *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004), in their Complaint as authority for the proposition that an optional form of benefit is part of the participant's accrued benefit. Compl. ¶ 120. That case is inapposite. Nothing in *Heinz* addresses or even alludes to optional forms of benefit. The Supreme Court's statement as cited by Plaintiffs (Compl. ¶ 120) is clearly not stating that an optional form of benefit is part of a participant's accrued benefit. Rather, the court is plainly holding that placing an additional condition (i.e., an expanded definition of the type of employment that will cut off a retiree's benefit) on the receipt of an accrued benefit after the accrued benefit is earned is "reducing" the accrued benefit just as if the actual amount of the accrued benefit was reduced. 541 U.S. at 744-45.

[20] Nothing in ERISA or the Internal Revenue Code requires that a plan provide any particular optional form of benefit for distribution of participants' retirement benefits or that the same optional form of benefit be available to all participants. In fact, the Treasury regulations specifically contemplate and allow the provision of different optional forms of benefits to different groups of participants and expressly sanction the permissibility of a dollar threshold to qualify for an optional form of benefit. *See* Treas. Reg. § 1.411(d)-4, Q&A-6(a)(1), (b)(1). However, if an optional form of benefit is provided under the plan, the optional form of benefit becomes a "protected benefit" entitled to protections against elimination in the same manner that the participant's underlying accrued benefit is entitled to protections against elimination. Treas. Reg. §§ 1.411(a)-11(a)(2); 1.411(d)(4), Q&A-1.

Respectfully submitted,

/S/ Charles D. T etrault_____

OF COUNSEL:                          Charles D. Tetrault (D.C. Bar No. 926527)
John L. Carter                       Vinson & Elkins L.L.P.
Miriam M. Burke                      The Willard Office Building
Vinson & Elkins L.L.P.               1455 Pennsylvania Avenue, N.W.
1001 Fannin, Suite 2300              Washington, D.C.  20004-1008
Houston, Texas  77002-6760           Telephone:  (202) 639-6551
                                     Facsimile:   (202) 639-6604
Javier Aguilar                       ctetrault@velaw.com
Geoffrey Amsel
AT&T Services, Inc.
175 E. Houston, 4th Floor
San Antonio, Texas  78205


*Attorneys for Defendants SBC Pension Benefit Plan and AT&T Inc.*


March 10, 2006


558297_1.DOC

- 45 -